Filed 8/21/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CALIFORNIA ADVOCATES FOR NURSING HOME REFORM et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> KAREN SMITH, as Director, etc., <br><br> Defendant and Appellant. | A147987 <br><br> (Alameda County Super. Ct. No. RG13700100) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 22, 2019, be modified as follows:

1.    On page 7, in the sentence that starts, "Though the statute makes no mention," delete the words "at trial" so the sentence reads:

> Though the statute makes no mention of the IDT reviewing capacity determinations, the Department presented evidence that IDT's can and do review capacity determinations made by attending physicians.

2.    On page 11, in the second full paragraph, at the end of the second sentence ending in the phrase "may not be used for end of life decisions", insert the following as part of the same paragraph:

> The court granted the requested writ of mandate in part, conditionally enjoining the enforcement of section 1418.8.  (See Judgment filed January 27, 2016, § I, ¶ 1 (A) ["the use of Health and Safety Code section 1418.8 is prohibited to the extent that said section does not require the resident be adequately notified in writing"]; *id*., § II, ¶ (A) ["the use of  Health and Safety Code section 1418.8 is prohibited for the administration of

1

antipsychotic drugs to residents unless authorized pursuant to the procedures set forth in Probate Code 3200 et seq., except in emergency situations"]; *id.*, § III, ¶ A ["the use of Health and Safety Code section 1418.8 is prohibited to make end of life decisions regarding the withholding or withdrawal of life-sustaining treatment for residents, except to the extent consistent with the resident's individual health care instructions, if any, and other wishes, to the extent known," subject to specified exceptions].)

3. On page 11, immediately following the above insert, begin a new paragraph that starts with the sentence "The judgment has been stayed pending this appeal."

4. On page 21, in footnote 6, in the second sentence beginning with "For decisions that strip a person", replace the language "for nearly a century, dating back to" with the word "since".

5. On page 31, in the first paragraph continuing from page 30, in the sentence that starts with "In effect, as we read the statute," insert the phrase "as an agent" at the end of the sentence after the word "representative".

6. On page 42, in the second full paragraph, at the beginning of the second sentence, delete "Thus," and start the sentence with "The Legislature".

7. On page 55, delete the entirety of subsection 5, entitled " 5. The Superior Court's Decision" ending on page 56 with the language "needs in nursing homes", which will require renumbering of all subsequent subsections in part IV.G.

8. On page 59, in the first sentence of the first full paragraph that starts "We admit to alarm", change the words "submitted at trial" at the end of the sentence to "submitted to the trial court."

9. On page 70, after the end of the first full paragraph, ending in "That is what we have done", and before part "V. DISPOSITION", using the same formatting that

2

appears throughout the opinion, insert the following new section, which will require that the subsequent "DISPOSITION" section be renumbered from V. to VI.:

## V. THE APPROPRIATE FORM OF RELIEF

As we read the Superior Court's judgment, it granted a writ of traditional mandate and issued equitable relief in the form of an injunction. That is understandable, since injunctive relief was among the remedies the petitioners requested in their prayer for relief. (First Amended Verified Petition for Writ of Mandate, Declaratory Relief and Injunction, filed January 15, 2015, at p. 38, ¶ 5 [requesting that the court "[e]njoin [the Department] from permitting the use of Section 1418.8 by all California skilled nursing and intermediate care facilities"].) They had grounds to do so. Even though " ' "[a] traditional writ of mandate under Code of Civil Procedure section 1085 is a method for *compelling* a public entity to perform a legal and usually ministerial duty" ' " (*Lippman v. City of Oakland*, *supra*, 19 Cal.App.5th at p. 756, italics added), in appropriate circumstances injunctive relief is available in a mandamus proceeding. (*County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 973 ["[t]he remedy [of permanent injunction] is available in a mandamus proceeding and is appropriate to restrain action which, if carried out, would be unlawful"].) But we have focused instead on petitioners' request for declaratory relief, which is another form of relief that may be issued in a mandamus proceeding. (*Leahey v. Dept. of Water and Power* (1946) 76 Cal.App.2d 281, 284.)

What we hold here, as explained above, is that rather than enjoining the use and enforcement of section 1418.8 on constitutional grounds, the appropriate remedial course was to adopt a saving construction of the statute by declaration. Not only is this remedial approach, in our view, more consistent with avoiding invalidation of statutes on constitutional grounds where reasonably possible, but it is also significant that we deal here with matters of administrative enforcement. Because "[m]andamus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner" (*California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 570), we are reluctant to prescribe any particular approach to conformance with the judgment.

Concerned about enforceability, petitioners argue on petition for rehearing that "mandamus against a public officer is a more adequate remedy than declaratory relief, because it commands performance, while a declaratory judgment simply pronounces the duty to perform . . . ."

3

(*Berkeley Sch. Dist. v. City of Berkeley* (1956) 141 Cal.App.2d 841, 845.) They contend that "[h]ow the judgment is implemented and enforced on remand will affect whether the procedural protections, which are so important to saving the statute from unconstitutionality, will be abstract aspirations or will actually benefit the 12,000 patients in need of these protections." And they request that we direct the superior court to retain jurisdiction to monitor the Director's implementation of the judgment.

We do not agree that the issuance of a writ is appropriate or necessary. To obtain a writ of mandate under Code of Civil Procedure section 1085, a petitioner must establish, among other things, " ' " '(1) [a] clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation].' " ' " (*Rivera v. Kent* (2019) 37 Cal.App.5th 529, 539 [directing reversal of judgment for writ of mandate where relevant statute and regulation did not impose ministerial duties upon agency].) A "ministerial duty" is a duty that is "required to be performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment." (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 593.) Because we do not conclude that the Director has failed to comply with any ministerial duty, there is no basis for issuance of a writ.

Nor do we see the need for retention of continuing jurisdiction. We are satisfied that, as the Director points out in her answer to the petition for rehearing, all parties who are responsible for complying with section 1418.8, or with its enforcement—including the Director, petitioners, the nursing homes that utilize the statute, and any court called upon to resolve any pertinent dispute under the statute—will now "be well aware of and obliged to abide by or enforce the statute's requirements" as we interpret it. We also agree with the Director that our opinion together with the resulting judgment will "provide binding and clear direction" and that "nursing homes . . . will risk administrative sanction, monetary liability, and other potential consequences (including license suspension or revocation, payment suspension, or other adverse actions), for any failures to comply with [section 1418.8's] requirements."

There is no change in the judgment.

Appellants' petition for rehearing is denied.

Dated: _____          _____, P. J.

4

A147987/*California Advocates for Nursing Home Reform v. Smith*

Trial Court:                          Alameda County Superior Court

Trial Judge:                          Hon. Evelio M. Grillo

Counsel:

Morton P. Cohen; Law Offices of Amitai Schwartz and Amitai Schwartz for Plaintiffs
        and Appellants.

BraunHagey & Borden, Matthew Borden, and J. Noah Hagey for California Long Term
        Care Ombudsman Association as Amicus Curiae on behalf of Plaintiff and
        Appellants.

AARP Foundation Litigation and William Alvarado Rivera for AARP, AARP
        Foundation, National Consumer Voice for Quality Long-Term Care, and Justice in
        Aging as Amici Curiae on behalf of Plaintiffs and Appellants.

Disability Rights California, Katherine Mathews, Salma Enan, and Pamela Lew as
        Amicus Curiae on behalf of Plaintiff and Appellants.

ACLU Foundation Disability Rights Program, Claudia Center, and Susan Mizner; ACLU
        Foundation of Northern California and Alan L. Schlosser as Amici Curiae on
        behalf of Plaintiff and Appellants.

Xavier Becerra and Kamala D. Harris, Attorneys General, Julie Weng-Gutierrez, Senior
        Assistant Attorney General, Susan M. Carson, Supervising Deputy Attorney
        General, Joshua N. Sondheimer, Deputy Attorney General for Defendant and
        Appellant.

Cole Pedroza, Curtis A. Cole, and Cassidy C. Davenport for California Medical
        Association, California Dental Association, and California Hospital Association as
        Amici Curiae on behalf of Defendant and Appellant.

Hooper, Lundy & Bookman and Mark E. Reagan for California Association of Health
        Facilities as Amicus Curiae on behalf of Defendant and Appellant.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CALIFORNIA ADVOCATES FOR NURSING HOME REFORM et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> KAREN SMITH, as Director, etc., <br><br>     Defendant and Appellant. | A147987 <br><br> (Alameda County <br> Super. Ct. No. RG13700100) |

## I.  INTRODUCTION

Health and Safety Code section 1418.8 (section 1418.8) sets forth procedures to be followed for nursing home residents who lack capacity to make their own health care decisions.  Most of the affected residents are elderly, many are poor, and all may be described as "unbefriended" in the sense they are without family members, friends or other legal surrogates to make health care decisions for them.  The statute requires an interdisciplinary team (IDT) approach to decisionmaking for these residents.

California Advocates for Nursing Home Reform (CANHR), a nonprofit entity advocating for the rights of nursing home patients, together with a nursing home resident and a taxpayer (collectively, petitioners), challenged the constitutionality of section 1418.8 under the California Constitution by a petition for writ of mandate against the Director of the Department of Public Health (Department), a position now held by Dr. Karen Smith (Director).

The superior court issued an order holding section 1418.8 unconstitutional in three respects, one on its face and two as applied:  It held the statute (1) on its face, violates due process under the California Constitution by failing to require notice to residents of a

physician's predicate determinations that the patient lacks capacity, has no surrogate decisionmaker, needs a recommended medical intervention, and has a right to judicial review; (2) was never intended to authorize IDT decisionmaking for administration of antipsychotic medication, and it violates due process, as applied, when used to authorize such drugs; and (3) violates the patient's privacy rights and is unconstitutional as applied to decisions regarding end of life withdrawal of care.

The court entered judgment accordingly, issuing a writ of mandate that prohibited enforcement of the statute in the absence of notice to the affected resident; prohibited use of the statute to administer antipsychotics; and prohibited use of the statute in end of life decisions, subject to several exceptions, including an exception for transfer to hospice care.

Both parties appealed. The Director claims the statute is constitutional in all respects, and petitioners argue it is unconstitutional in additional particulars beyond those enjoined. Petitioners take the position, ultimately, that the statute should be declared unconstitutional in its entirety and that we should forbid its enforcement categorically, leaving the Legislature to begin again trying to solve the problem of how to provide for the medical needs of incapacitated, unbefriended nursing home residents.

We see merit to much of the superior court's analysis concluding that section 1418.8 is constitutionally deficient, but agree with enough of the Director's position to convince us that the proper course is to construe the statute to uphold its constitutionality rather than enjoin its enforcement and use. We shall therefore reverse and remand with directions to enter a modified judgment requiring nursing homes utilizing section 1418.8 to adopt and adhere to additional procedures we have concluded are necessary to preserve its constitutionality.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  History and Purpose of Section 1418.8

When it was enacted in 1992, section 1418.8 was intended to give skilled nursing

facilities and intermediate care facilities[1] a means of decisionmaking for incapacitated residents without someone "with legal authority to make" health care decisions on his or her "behalf" (§ 1418.8, subd. (a)), including "day-to-day medical treatment decisions . . . on an on-going basis," which were difficult to secure using the pre-existing legal methods. (Stats. 1992, ch. 1303, § 1(b), p. 6327.) A decision by Division Five of this district, which we will discuss in detail below, also observed that section 1418.8 "applies only to the relatively nonintrusive and routine, ongoing medical intervention[.]" (*Rains v. Belshé* (1995) 32 Cal.App.4th 157, 186 (*Rains*).)

Before the statute's enactment, capacity decisions were made in superior court on a petition to determine capacity to make health care decisions. (Prob. Code, § 3200 et seq.) "A petition may be filed to determine that a patient lacks the capacity to make a health care decision concerning specified treatment for an existing or continuing condition, and further for an order authorizing a designated person to make a health care decision on behalf of the patient." (Prob. Code, § 3201, subd. (b).) A petition may also seek a finding by the court that the patient has such capacity. (*Id*., subds. (a), (c).)

In enacting section 1418.8, the Legislature sought to provide a decisionmaking alternative when recommended medical procedures require informed consent. (See *Cobbs v. Grant* (1972) 8 Cal.3d 229, 244-245 [informed consent required when there is a known risk of death or serious bodily harm as a result of a recommended treatment].) As described in *Rains*, section 1418.8 addresses a "very difficult and perplexing problem: how to provide nonemergency but necessary and appropriate medical treatment,

---

[1] Skilled nursing facilities provide 24-hour skilled nursing and supportive care to resident individuals whose primary need is for the availability of skilled nursing care on an extended basis. (See Health & Saf. Code, § 1250, subd. (c)(1).) Intermediate care facilities provide 24-hour inpatient care to individuals who are developmentally disabled or who otherwise do not require continuous skilled nursing care, but have recurring need for skilled nursing supervision and require supportive care. (See *id*., § 1250, subds. (d), (g) & (h).) We will refer to skilled nursing facilities and intermediate care facilities collectively and generically as nursing homes through the remainder of the opinion. We use "patient" and "resident" interchangeably, in each case referring to one who lives in a nursing home.

frequently of an ongoing nature, to nursing home patients who lack capacity to consent thereto because of incompetence, and who have no surrogate or substitute decision maker with legal authority to consent for them." (*Rains*, *supra*, 32 Cal.App.4th at p. 166, fn. omitted; see *id*. at p. 178 ["continuing and significant dilemma"].)

To address this "legal conundrum of long standing" (*Rains*, *supra*, 32 Cal.App.4th at p. 166), section 1418.8—utilizing what is described as a "team approach to assessment and care planning"—authorizes an IDT composed of health professionals and other skilled staff from the nursing home, along with a "patient representative," "where practicable," to review and authorize medical treatment. (§ 1418.8, subd. (e); see *id*., subds. (e) ["[t]he interdisciplinary team shall oversee the care of the resident"], (e)(3) ["[t]o determine the desires of the resident, the interdisciplinary team shall interview the patient, review the patient's medical records, and consult with family members or friends"], (g) [required reviews by "interdisciplinary team" of prescribed medical intervention], (h) [review by "interdisciplinary team" within a week of any emergency intervention resulting in "physical or chemical restraints"].)

In establishing a "team" decisionmaking approach, the Legislature recognized that the existing mechanisms for court authorization of medical treatments for such patients under provisions of the Probate Code were slow and inadequate, and therefore could interfere with residents' ability to receive timely medical care:  "(b) The current system is not adequate to deal with the legal, ethical, and practical issues that are involved in making health care decisions for incapacitated skilled nursing facility or intermediate care facility residents who lack surrogate decisionmakers.  Existing Probate Code procedures, including public conservatorship, are inconsistently interpreted and applied, cumbersome, and sometimes unavailable for use in situations in which day-to-day medical treatment decisions must be made on an on-going basis.  [¶] (c) Therefore, it is the intent of the Legislature to identify a procedure to secure, to the greatest extent possible, health care decisionmakers for skilled nursing facility or intermediate care facility residents who lack the capacity to make these decisions and who also lack a surrogate health care decisionmaker."  (Stats. 1992, ch. 1303, § 1, pp. 6326-6327.)

4

Indeed, *Rains* spoke of a "delay of two to six months frequently necessary to secure a ruling on a petition authorizing treatment under Probate Code section 3201." (*Rains*, *supra*, 32 Cal.App.4th at p. 166.)

### B. Summary of the Provisions of Section 1418.8

Under section 1418.8, if a resident's "attending physician and surgeon" determines that a resident lacks capacity to provide informed consent to a proposed treatment, and determines there is no person with legal authority to make the treatment decision on the resident's behalf, the physician is then required to inform the facility of these determinations, and an IDT must be convened to review and authorize the proposed treatment. (§ 1418.8, subds. (a)-(e).)

Section 1418.8 sets out standards by which the attending physician must determine a resident's decisionmaking capacity and the absence of any authorized surrogate decisionmaker. To make such determinations, the physician must interview the resident, review the resident's medical records, and consult with facility staff and family members and friends of the resident, if identified. (§ 1418.8, subds. (b) & (c).) A resident lacks health care decisionmaking capacity if he or she "is unable to understand the nature and consequences of the proposed medical intervention, including its risks and benefits, or is unable to express a preference regarding the intervention." (*Id*., subd. (b); see also Prob. Code, § 4609.) The absence of any person with legal authority to make treatment decisions on a resident's behalf may be found if there is no "person designated under a valid Durable Power of Attorney for Health Care, a guardian, a conservator," or any "next of kin" (§ 1418.8, subd. (c)) available and willing to "take full responsibility" for such decisions. (*Id*., subd. (f).) The physician's determinations regarding incapacity and the lack of a surrogate decisionmaker, and the "basis for those determinations," must be documented in the resident's medical record. (*Id*., subd. (*l*).)

An IDT at the facility must then "conduct [a] . . . review of the prescribed medical intervention prior to the administration of the medical intervention." (§ 1418.8, subd. (e).) The IDT must include "the resident's attending physician, a registered professional nurse with responsibility for the resident, other appropriate staff in

5

disciplines as determined by the resident's needs, and, where practicable, a patient representative." (*Ibid*.) We note, however, the only *required* participants are the attending physician (who is often the medical director of the nursing home) and a nurse (employed by the nursing home). (*Ibid.*) The patient representative may be a "family member or friend of the resident who is unable to take full responsibility for the health care decisions of the resident," or any "other person authorized by state or federal law."[2] (§ 1418.8, subd. (f).) The medical records documenting the attending physician's determinations that the resident lacks capacity to provide informed consent and lacks a surrogate decisionmaker must be made available to the patient representative, if the resident has one. (*Id*., subd. (*l*).) There is no requirement that the same records be made available to the resident. For patients without a representative, as is often the case, no one receives the information intended for the resident.

The IDT, in reviewing a proposed treatment decision, must consider each of the following: (1) The "physician's assessment of the resident's condition"; (2) "The reason for the proposed use of the medical intervention"; (3) The "desires of the resident," based on a patient interview, medical records review, and consultation with any identified family or friends; (4) The "type of medical intervention to be used in the resident's care";

---

[2] "Persons who may act as the patient's representative include a conservator, as authorized by Parts 3 and 4 of Division 4 of the Probate Code (commencing with Section 1800), a person designated as attorney in fact in the patient's valid Durable Power of Attorney for Health Care, patient's next of kin, other appropriate surrogate decisionmaker designated consistent with statutory and case law, a person appointed by a court authorizing treatment pursuant to Part 7 (commencing with Section 3200) of Division 4 of the Probate Code, or, if the patient is a minor, a person lawfully authorized to represent the minor." (Cal. Code Regs., tit. 22, § 72527, subd. (d).) When read within the context of the overall statutory scheme, this open-ended definition of surrogacy contemplates that, in some circumstances (i.e., a conservator, an attorney in fact, next of kin), a "patient representative" might also be an agent in the sense of someone legally authorized to act on behalf of the patient for certain purposes, but since definitionally a patient representative serves only where there is no one available to "to take full responsibility for the health care decisions of the resident," the "patient representative" is not the patient's legal delegate for health care decisionmaking. (§ 1418.8, subd. (f); see *post* pp. 31-32.)

(5) "The probable impact on the resident's condition, with and without the use of the medical intervention"; (6) "Reasonable alternative medical interventions considered or utilized and reasons for their discontinuance or inappropriateness." (§ 1418.8, subd. (e)(1)-(6).) Any treatment initiated pursuant to section 1418.8 must be done "in accordance with acceptable standards of practice." (*Id.*, subd. (d).) The IDT must reevaluate the treatment "at least quarterly or upon a significant change in the resident's medical condition." (*Id.*, subd. (g).) Though the statute makes no mention of the IDT reviewing capacity determinations, the Department presented evidence at trial that IDT's can and do review capacity determinations made by attending physicians. Petitioners argue section 1418.8 does not authorize such in-house review of capacity and surrogacy decisions, and they claim the superior court erred in adopting the Department's interpretation that the statute allows the IDT to review those predicate decisions.

In the event of an emergency, the facility may administer treatment ordered by a physician for the resident, including applying "physical or chemical restraints," without prior IDT approval. (§ 1418.8, subd. (h).) Generally speaking, "chemical restraints" are antipsychotic medications. (See Cal. Code Regs., tit. 22, § 72018 [a chemical restraint is "a drug used to control behavior and used in a manner not required to treat the patient's medical symptoms"].) If physical or chemical restraints are applied, the IDT must meet "within one week of the emergency for an evaluation of the medical intervention." (§ 1418.8, subd. (h).)

Section 1418.8 preserves the right of a resident "to seek appropriate judicial relief to review the decision to provide the medical intervention." (§ 1418.8, subd. (j).) Under that provision, "affected persons or their representatives, such as a friend, public guardian, or other concerned person or entity, are afforded an avenue by which they may obtain 'appropriate judicial relief,' including a temporary restraining order and other injunctive relief prior to treatment, thereby satisfying due process principles." (*Rains*, *supra*, 32 Cal.App.4th at p. 185.) Judicial review "may encompass review of the initial medical determination that the patient lacks capacity to give informed consent[.]" (*Id.* at p. 185, fn. 7.)

7

## C. The History of This Lawsuit

CANHR is, and has been since 1983, a statewide nonprofit organization dedicated to improving the choices, care and quality of life for California's long-term care consumers. Through direct advocacy, community education, legislation and litigation, CANHR has sought to educate and support nursing home residents and their advocates regarding their legal rights and remedies and to create a united voice for long-term care reform and humane alternatives to institutionalization. The superior court found CANHR had public interest standing to pursue the causes of action raised in this case, and we agree. (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 167.)

Petitioner Gloria A. was a 63-year-old truck driver who ended up in a nursing home and was declared incapacitated by her treating physician upon entry into the facility. Just 20 days later, she was examined by another physician who found: "This resident has the capacity to understand and make decisions." Nevertheless, the incapacity determination remained in effect for nine months. Gloria A. never received notice of the physician's determination, of his finding that she had no surrogate to make health care decisions for her, of the treatment and restrictions he recommended, or of her right to judicial review of his decisions.

Nothing in section 1418.8 expressly requires such notice. Gloria A. learned she had been declared incapacitated only because she tried to go on a picnic with another resident and her sister, and she was not allowed to leave the facility based on her doctor's orders and his finding of incapacity. Gloria A. believed she was competent and was told by her social worker she was competent. Gloria A. was later given antipsychotic medication, though she hated it and never consented to it, at the decision of an IDT. Because of her supposed incapacity, she also lost control over her finances. Gloria A. died four months after the petition was filed in superior court.

Petitioner Anthony Chicotel is a taxpayer who challenges the expenditure of tax money in enforcing section 1418.8, which he claims is unconstitutional. (See *Vasquez v. State of California* (2003) 105 Cal.App.4th 849, 854.)

8

In October 2013, CANHR and Gloria A. filed a petition for writ of mandate, declaratory relief, and an injunction, challenging section 1418.8 as unconstitutional on its face and as applied, alleging eight respects in which the statute is unconstitutional or otherwise unenforceable, as set forth in eight separate causes of action: (1) the absence of prior notice and the opportunity for a meaningful hearing; (2) the absence of representation for the resident at the incompetence and surrogate determinations; (3) the absence of a requirement of an adjudication of incompetence; (4) the need for a neutral person or body to decide all issues of incapacity, surrogacy and treatment; (5) the need for neutrals to review and give consent to the treatment; (6) the need for and absence of enforcement as to the purported statutory requirement of a patient representative at the review and for the patient representative to consent to the treatment; (7) the need for full due process rights in applying the statute to administer antipsychotic drugs; and (8) the need for full due process rights in applying the statute to withdraw treatment and cause death.

The first five causes of action were brought as facial challenges to the statute; the last three were as-applied challenges. In January 2015, the petitioners filed the operative first amended petition alleging the same causes of action, but adding Chicotel as a petitioner.

**D. The Superior Court's Order and Judgment and the Issues on Appeal**

In response to petitioners' motion for writ of mandate, declaratory relief, and injunction, the superior court issued its order in June 2015 granting, in part, and denying, in part, a writ of mandate, and entered judgment accordingly on January 27, 2016. The superior court ruled that section 1418.8 is facially unconstitutional under the state due process clause (Cal. Const., art. I, § 7) and enjoined its use on grounds that the statute does not require adequate notification in writing to a nursing home resident regarding (1) the physician's determination of incapacity; (2) the physician's determination that there is no surrogate decisionmaker; (3) the medical intervention prescribed by the physician and the referral to the IDT for decisionmaking regarding the treatment; and (4) the availability of judicial review of any such decisions made by the physician or the IDT.

9

The superior court did not hold such notice was required prior to an incapacity decision being made by the physician, but presumably notice would be required before the IDT made a decision on the recommended treatment. The superior court did not specify that the medical intervention could not be implemented until after the capacity decision was reviewed by the court if the resident sought judicial review, but that requirement is implicit in the " 'opportunity to be heard' " at a meaningful time and in a meaningful manner. (*Armstrong v. Manzo* (1965) 380 U.S. 545, 552.)

The Director insists the due process clause of the state Constitution does not require such notice to be embedded in the statute, in part because other statutes and regulations, both state and federal, virtually ensure the patient will be notified of the matters specified by the superior court. Petitioners, on the other hand, claim the superior court did not go far enough; they contend in their cross-appeal that notice should be required *before* an incapacity decision is made. The Director suggests, even if we find the statute constitutionally wanting, we should not declare it unenforceable, but rather should read into it a notice requirement.

The superior court also held that section 1418.8, as applied, violates residents' state constitutional autonomy privacy rights without due process insofar as it has been used to authorize administration of antipsychotic medications without notice and an opportunity to be heard, and without a judicial determination of incapacity or any form of review by a neutral decisionmaker. Petitioners presented evidence, amplified by their supporting amici curiae, suggesting that antipsychotics are administered to nursing home residents for off-label use far too often, not to treat patients' mental health problems, but to make patients more compliant. To avoid an interpretation that it deemed unconstitutional, the superior court held the statute was never meant to apply and does not apply to the administration of antipsychotics. The Director contends the statute is not constitutionally infirm, and claims its text and legislative history support its application to the administration of antipsychotic drugs.

The superior court also held the statute violates the patient's constitutional privacy rights when applied to decisions to withdraw life-sustaining treatment and end life. The

10

Director argues the superior court should not even have reached this issue based on lack of state action and because the issue is not ripe and any opinion on the subject is merely advisory.

In addition to supporting the superior court's conclusions about the aspects of the statute deemed unconstitutional or unenforceable except on specified conditions, petitioners, in their cross-appeal, argue section 1418.8 is unconstitutional in the following additional ways, which were rejected by the superior court: (1) the notice required by the superior court must be given *prior to* the incapacity determination, with a meaningful opportunity to oppose that determination separately from or instead of the after-the-fact judicial review provided by the statute; (2) the capacity decision must be made by a judicial officer, rather than a doctor; (3) an attending physician must not be allowed to act as decisionmaker for capacity determinations (and must not be allowed to serve on the IDT) because he or she is non-neutral; (4) legal counsel or a counsel substitute must be afforded the resident as a matter of due process; and (5) the statute cannot be read as allowing the IDT to review capacity and surrogacy decisions, which leaves patients without recourse except by filing in superior court, which their poor health prevents them from doing.

Finally, the superior court's determination that section 1418.8 could not be used for end of life decisions was subject to four exceptions, each of which petitioners claim is inconsistent with the statute and the state Constitution, namely (a) decisions implementing a patient's wish to end life; (b) decisions carrying out a patient's instructions; (c) decisions to decline patient instructions for ineffective care or care contrary to generally accepted medical standards; and (d) decisions to initiate hospice care. Petitioners contend those exceptions are too expansive and unconstitutionally undermine the superior court's broader conclusion that section 1418.8 may not be used for end of life decisions. The judgment has been stayed pending this appeal. In addition to the parties' briefing, we have received amicus curiae briefs from various organizations

11

supporting the positions of either petitioners or the Department.[3]  We shall discuss the points raised by those briefs as we deem them relevant to our decision.

## III.    SUMMARY OF CONCLUSIONS

### A.  Notice and Opportunity to be Heard

Employing independent review, we conclude, as did the superior court, that the statute would be unconstitutional on its face under the due process clause of article I, section 7 of the California Constitution if it failed to require notice to the nursing home resident that he or she has been found to lack decisionmaking capacity and that a surrogate decisionmaker is unavailable—the two findings which serve to take decisionmaking authority out of the hands of the resident—before a recommended medical intervention may be initiated.  But to preserve section 1418.8's constitutionality, we construe the statute to require such notice rather than prohibit its enforcement, as the superior court did.  We also conclude that the requisite notice may be given immediately after the incapacity and lack-of-surrogacy determinations are made but must be given before a recommended medical intervention may be initiated.  The notice must be given both orally and in writing to ensure its effectiveness, and the written notice must be given not only to the affected nursing home resident but to at least one other competent person whose interests are aligned with those of the resident.

We agree with the superior court that, as a matter of due process, before treatment is begun a resident is entitled to a meaningful opportunity to be heard in opposition to the determinations of incapacity and unavailability of a surrogate, as well as to a

---

[3] Amicus curiae briefs on behalf of petitioners were filed by California Long Term Care Ombudsman Association (CLTCOA), Disability Rights California (DRC), the American Civil Liberties Union Foundation Disability Rights Program and American Civil Liberties Union of Northern California (collectively, ACLU), and AARP, AARP Foundation, the National Consumer Voice for Quality Long-Term Care, and Justice in Aging (collectively, AARP).  Amicus curiae briefs on behalf of the Department were filed by the California Medical Association, California Dental Association, and California Hospital Association (collectively, CMA), and California Association of Health Facilities (CAHF).

12

recommended medical intervention. Thus, the required notice must advise the resident of the fact that determinations of incapacity and absence of a surrogate have been made, of any proposed treatment decided upon by the IDT, and of his or her right to seek judicial review. The statute already provides for judicial review (§ 1418.8, subd. (j)), which allows for a neutral judge's decision, representation by counsel (Prob. Code, § 3205), and a full evidentiary hearing for those patients aggrieved by the incapacity or lack-of-surrogacy decisions or who object to the treatment recommendation. Because medical urgency may not allow for judicial review before a treatment decision must be undertaken, we conclude, in those exigent circumstances—so long as pretreatment notice is given—the statute complies with minimal due process demands by giving the patient an opportunity to be heard during the IDT process itself. The full accoutrements of judicial process, with a right to counsel, are not constitutionally mandated.

## B. Mandatory Inclusion of Independent Patient Representative on IDT

Patients subject to section 1418.8 presumably cannot competently speak for themselves, to anyone, in making their desires and intentions known. The practical reality, then, is that the Legislature has set up a process the objective of which is to discern, by the best approximation possible, what those desires and intentions would be if the patient could communicate effectively. No process designed to achieve that end could be perfect, but we think the one the Legislature has chosen here—which is based on a model of collaborative decisionmaking in which a number of different perspectives are represented—satisfies due process. We believe an essential feature of the IDT process that saves it from constitutional infirmity in non-emergency circumstances is the inclusion on the IDT of a patient representative who is independent of the nursing home staff.

Although the statute provides for a patient representative to participate on the IDT "where practicable," we give that phrase a narrow reading so that a patient representative must be appointed for every nursing home resident determined to be decisionally incapacitated and without a surrogate decisionmaker under section 1418.8, subdivision (a). We view the role of the patient representative as so crucial to the

13

functioning and constitutionality of the statute that if the patient has no family or friends willing to serve on the IDT, the nursing home must find another person unaffiliated with the nursing home to serve as patient representative for each person subject to the IDT decisionmaking procedure. Only in the case of an urgent medical emergency may an IDT act without the patient representative's participation.

### C. Administration of Antipsychotic Medication

We reject petitioners' first as-applied challenge urging that section 1418.8 be voided to the extent it allows, in non-emergency circumstances, the administration of antipsychotic drugs to nursing home residents without judicial authorization. We conclude, here too as a matter of statutory construction, that section 1418.8 may be employed in making decisions relating to administration of antipsychotic medications, and that, so construed, the statute does not violate the patient's privacy or due process rights.

Section 1418.8, subdivision (h), expressly authorizes "chemical restraints"— which usually means antipsychotics—to be administered in emergency situations. We see no reason why prescriptions for use of antipsychotics for an ongoing psychosis could not also be prescribed through the IDT process in non-emergency circumstances. While we condemn the use of antipsychotics for purposes of ongoing patient control, which we are told has been a problem in the past in nursing homes, we believe the Department's strict enforcement of the network of federal and state statutes and regulations constraining the prescription of such drugs in nursing homes is sufficient to prevent continuing abuse. If the Department is failing to carry out its enforcement obligations in policing the use of antipsychotic medications by nursing homes, that is a matter which should be addressed in a case presenting the issue for decision on an appropriate record. We do not have such a record here.

### D. End of Life Decisionmaking

Finally, we reject petitioner's second as-applied challenge that categorically, under no circumstances, may section 1418.8 be applied to what the parties call end of life decisionmaking, a phrase that, on the record presented here, we understand to mean any

14

decision to impose or change a physician order for life sustaining treatment (POLST) or any decision to provide hospice care to a terminally ill patient. So long as constitutionally required notice is given, as outlined above, and so long as the IDT includes an independent patient representative, as further outlined above, we think that use of the IDT decisionmaking process for these kinds of end of life decisions adequately safeguards the constitutionally protected right of an incapacitated nursing home resident to refuse medical treatment. The superior court appears to have recognized as much, building into the injunction four exceptions designed to cover various aspects of end of life decisionmaking. Because we conclude there is no constitutional infirmity with the use of section 1418.8 for the specific kinds of end of life decisionmaking presented on this record, we have no occasion to address the need for any of these exceptions or whether it is even appropriate to characterize them as exceptions.

Although we hold that section 1418.8 passes constitutional muster when used for some specific types of end of life decisionmaking, we emphasize what we do not hold. Because, in some circumstances, a decision to cease life-sustaining care will require the intervention of a neutral, judicial decisionmaker under either *Conservatorship of Wendland* (2001) 26 Cal.4th 519 (*Wendland*) (conscious but incapacitated patients) or *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185 (*Drabick*) (unconscious patients)—cases which involve withdrawal of life support—we anticipate that, somewhere, a line must be drawn between on the one hand cessation of curative care for a decisionally incapacitated person without a surrogate (for whom the IDT may act), and on the other hand, withdrawal of life support (for whom resort to the judicial process would be necessary). But we have no occasion to address that issue here. Drawing the appropriate line involves a myriad of medical and other circumstances that we cannot begin to predict based on the limited record before us, so we simply note this outer boundary to constitutionally proper use of the IDT process, without reaching it in this case.

15

## IV. DISCUSSION

### A. Autonomy Privacy Protects Residents' Rights to Make Medical Decisions and Due Process Attaches to Deprivation of Those Rights

#### 1. *The Right of Autonomy Privacy*

"[T]he explicit right of privacy protected under California Constitution, article I, section 1, protects two classes of privacy interests: '(1) interests in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy").' (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35[].)" (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 850-851.)  This case deals with autonomy privacy, which has been recognized as bestowing upon a competent adult the right to refuse medical treatment, even treatment necessary to sustain life. (*Wendland*, *supra*, 26 Cal.4th at p. 530.)  The right of privacy guarantees an individual the freedom to choose to reject, or refuse to consent to, intrusions of his or her bodily integrity.  (*Id*. at pp. 531-532.)  Under California law a "competent, informed adult has a fundamental right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the personal consequences." (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 732.)

The question here, of course, is how the patient's will can best be learned and effectuated, and his or her rights adequately protected, when he or she lacks decisional capacity, has no advance health care directive, and the attending physician is aware of no next of kin or other person willing to serve as a legally authorized proxy decisionmaker. (Cf. *In re Conroy* (N.J. 1985) 486 A.2d 1209, 1219-1220.)  Section 1418.8 provides a procedure for dealing with such circumstances, authorizing a treating physician to declare the patient to lack capacity to make his or her own medical decisions, and thereby to trigger convening of an IDT.  (§ 1418.8, subds. (a) & (e).)  Petitioners claim leaving the capacity decision in the hands of an attending physician—or any physician—violates the

16

constitutionally-protected privacy rights of the patient. They contend a judge or judicial officer must make that decision.

### 2. *Due Process*

The right to refuse necessary medical treatment is a fundamental liberty interest protected by the due process clause of the Fourteenth Amendment (*Washington v. Harper* (1990) 494 U.S. 210, 221-222; *Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 278; *People v. Petty* (2013) 213 Cal.App.4th 1410, 1417) and by the privacy guarantee of the California Constitution and the common law (*In re Qawi* (2004) 32 Cal.4th 1, 17 (*Qawi*); *K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 170-171). Petitioners contend various aspects of section 1418.8 violate residents' due process rights under article I, section 7 of the California Constitution.

### B. *Rains v. Belshé* (1995) 32 Cal.App.4th 157

In 1995, Division Five of this district was faced with a constitutional attack on section 1418.8 much like the one now before us. *Rains*, *supra*, 32 Cal.App.4th 157 held section 1418.8 was constitutional against a challenge on state and federal due process grounds and on privacy grounds under the state Constitution. (*Id*. at p. 171.) The *Rains* court reasoned that a patient's privacy interests were greatly attenuated by the fact that he or she needed a medical intervention but lacked capacity to give informed consent. (*Id.* at p. 172.) The court also found an overriding state interest in affording nursing homes the means to provide timely ongoing care for their residents without being constrained by cumbersome, time-consuming procedures and unwarranted judicial intervention. (*Id*. at pp. 176-177.)

Though *Rains* held section 1418.8 was not unconstitutional under the due process clause of the state or federal Constitution, it so held on the basis that (1) due process does not require that capacity and surrogacy decisions be made by judges (*Rains*, *supra*, 32 Cal.App.4th at p. 184); (2) objective standards for determining the capacity and

17

surrogacy issues are set forth in the statute[4] (*Rains, supra,* at pp. 179-180); (3) patient representatives will bring the resident's views to the IDT (*id.* at pp. 182-186); (4) other state and federal regulations "both limit and supplement the interdisciplinary team decisionmaking approach by granting certain rights and safeguards to affected residents" (*id.* at p. 186); and (5) judicial review is available to nursing home residents under section 1418.8, subdivision (j) (*Rains, supra,* at pp. 182, 184-185). (See generally *id.* at pp. 178-187.)

As we shall discuss, petitioners contend the Supreme Court's intervening decision in *Qawi*, *supra*, 32 Cal.4th 1 calls for a different outcome in this case. Fundamentally, petitioners question whether capacity is a medical decision that can be made by a physician, as *Rains* held (*Rains*, at pp. 177, 179-182), or a legal decision that must be made by a judge (see *Qawi*, *supra*, 32 Cal.4th at p. 17). They further contend their evidence shows the statute is not being applied within the limits established by *Rains*, as when it is used to prescribe antipsychotic medications or to make end of life decisions.

Significantly, the panel deciding *Rains* relied on an interpretation that section 1418.8 "by its own terms applies only to the relatively nonintrusive and routine, ongoing medical intervention, which may be afforded by physicians in nursing homes; it does not purport to grant blanket authority for more severe medical interventions such as medically necessary, one-time procedures which would be carried out at a hospital or other acute care facility, as to which compliance with Probate Code section 3200 et seq. would still be required, except in emergency situations." (*Rains*, *supra*, 32 Cal.App.4th

---

[4] When originally enacted in 1992, such standards were not included. (Stats. 1992, ch. 1303, § 1, p. 6327 (Assem. Bill No. 3209).) The trial judge in *Rains* ruled that the statute, as enacted, was unconstitutional. (*Rains*, *supra*, 32 Cal.App.4th at p. 162.) Before the appeal was decided, the Legislature amended section 1418.8 to include objective standards and rules for how the competency and surrogacy decisions were to be made; it added the provisions now contained in subdivisions (b) and (c) of section 1418.8. (Stats. 1994, ch. 791, § 1, p. 3913 (Assem. Bill No. 1139); *Rains*, at pp. 162-163.) The Court of Appeal in *Rains* reviewed the constitutionality of the amended statute and found it was constitutional. (*Rains*, at pp. 162, 165-166.)

18

at p. 186.)  *Rains* appears to have reached this conclusion on the basis of uncodified language in the preamble to the 1992 bill that established section 1418.8, which indicated the statute was intended, at least in part, to facilitate "day-to-day medical treatment decisions . . . on an on-going basis." (Stats. 1992, ch. 1303, § 1(b), p. 6327; accord *Rains*, at p. 179; see parts II.A & II.B, *ante*.)  Beyond that, *Rains* points to no language in section 1418.8 indicating it is so limited.

Petitioners contend *Rains* thereby established legal limits on the application of the IDT procedure, but, on the record they have produced, they have shown the law is presently being extended far beyond those limits.  Short of life-ending decisions covered by *Wendland, supra,* 26 Cal.4th 519, or *Drabick, supra,* 200 Cal.App.3d 185, the Director, in response, takes the position there are no limitations on the scope or subject matter of medical decisions that can be made using section 1418.8.  She urges an interpretation of the statute that allows IDT's to make all medical decisions for nursing home residents under their care.

### C.  The Standard of Review

This case arises on appeal from the issuance of a writ of mandate under Code of Civil Procedure section 1085.  In such a posture, factual issues are reviewed for substantial evidence, but legal issues, such as statutory or constitutional interpretation, are reviewed de novo.  (*Boyer v. County of Ventura* (2019) 33 Cal.App.5th 49, 53; see *Lippman v. City of Oakland* (2017) 19 Cal.App.5th 750, 756.)  Where the facts are not in dispute, purely legal issues are involved in the determination of the facial constitutionality of a statute, and we apply a de novo standard of review.  (*Alviso v. Sonoma County Sheriff's Dept.* (2010) 186 Cal.App.4th 198, 204.)  On the other hand, an as-applied challenge "contemplates analysis of the facts of a particular case . . . to determine the circumstances in which the statute . . . has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right."  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  When reviewing an as-applied constitutional challenge on appeal, we defer to the superior court's findings on historical facts that are supported by substantial

19

evidence and then independently review the constitutionality of the statute under those facts. (*C.M. v. M.C.* (2017) 7 Cal.App.5th 1188, 1198; *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127-1130.)

### D. Facial Challenge: The Due Process Requirement of Notice and an Opportunity to be Heard

#### 1. *The Superior Court's Ruling*

The superior court's June 2015 order in this case observed that *Rains* did not deal specifically with the question of notice to the patient of the decisions on capacity and surrogacy, and it therefore concluded *Rains* was not controlling on that point. *Rains* held the statute did not violate due process, even though the incapacity decision was "without notice" to the nursing home resident. (*Rains*, *supra*, 32 Cal.App.4th at p. 178.) Although the court mentioned the notice issue only in passing, notice was one of the attributes of a fair hearing that the petitioner in *Rains* claimed was lacking in the IDT procedure implemented by section 1418.8. (*Rains,* at p. 178.) Because "cases are not authority for propositions not expressly considered" (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1491), the superior court correctly recognized that this case calls for a decision on an aspect of due process that *Rains* left unaddressed.

Starting from the premise that a patient's privacy right to refuse medication is not extinguished when a person resides in a nursing home (*Rains*, *supra*, 32 Cal.App.4th at p. 171; see *Drabick*, *supra*, 200 Cal.App.3d at p. 208 [privacy rights survive incompetence]), the superior court reasoned that notice and an opportunity to be heard are the touchstones of due process when the deprivation of fundamental rights is threatened.[5] Under *People v. Ramirez* (1979) 25 Cal.3d 260, the superior court considered: "(1) the private interest that will be affected by the official action, (2) the risk of an erroneous

---

[5] *Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 725; *Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314 ("notice reasonably calculated, under all the circumstances, to apprise interested parties . . . and afford them an opportunity to present their objections").

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.* at p. 269.)

The surpassing importance of the individual rights at stake, the individual's dignity interests, the complete elimination of the patient's actual participation in the process, the risk of erroneous deprivation, and the minimal fiscal and administrative burden of notifying patients led the trial court to hold that section 1418.8, on its face, "violates a patient's due process rights by failing to provide for adequate notice [of four specific items of information:] [1] the determination of incapacity, [2] the determination of the absence of a legal substitute decision maker, [3] the prescribed medical intervention and [4] the right to seek review under section 1418.8(j)." Without adequate notice in each of these four areas, the court concluded, the patient will have no meaningful opportunity to oppose decisions made by the IDT.[6]

The Director attacks this conclusion as unfounded, claiming that a denial of due process cannot be asserted under California Constitution, article I, section 7, unless the right of which the complainant claims to have been deprived is one protected by statute

---

[6] Though the court's lack of notice ruling is rooted in the modern style of due process analysis under *People v. Ramirez*, its conclusion was broadly consistent with California law going back nearly a century. For decisions that strip a person perceived to be incapable of decisionmaking capacity of the right to personal autonomy, a due process requirement of written notice to that person of the deprivation has been recognized for nearly a century, dating back to *Grinbaum v. Superior Court* (1923) 192 Cal. 528, 540-541 ["requirement . . . that notice in some form and of some manner of service must be given to the individual alleged to be an insane or incompetent person . . . [r]ests upon the fundamental doctrine, as old as Magna Carta, that no person can be deprived of life, liberty, or property without due process of law"].)

or by the constitution.  She further argues due process protections attach only where an adjudicatory hearing is provided by statute.  Besides, the Director suggests, the capacity decision is medical, not legal, and does not trigger due process protections.  She further contends, because section 1418.8 is implemented directly by nursing homes, no state action is involved and hence the due process clause is inapplicable.  In her view, notice is not required.

We reject the Director's contentions as a legal matter; state deprivation of a constitutionally guaranteed right is constrained by due process, even if there is no separate statute granting that right.  And the right to determine one's own health care options involves fundamental liberty interests, as well as privacy interests.  (*People v. Petty*, *supra*, 213 Cal.App.4th at p. 1417.)  But even if a statutory right needed to be identified, one exists in Probate Code section 4650, subdivision (a):  "In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn."  Given this recognized statutory protection for every individual's health care decisionmaking, we are satisfied the right petitioners seek to vindicate is one protected by due process.

We are unpersuaded by the Director's insistence that what petitioners complain about, at bottom, is isolated private conduct by a few nursing homes, that there is no state action here, and thus there is no basis to assert a due process claim.  Although section 1418.8 may be directly implemented by nursing homes, the Department is responsible for oversight, inspection and surveying nursing homes to enforce the statute's implementation.  (Health & Saf. Code, § 1279.)  Moreover, not only are petitioners mounting a challenge to a statutory scheme enacted by the state Legislature, but nursing homes are, in effect, performing the state's obligations under the *parens patriae* doctrine, which requires the state to care for its most vulnerable residents who cannot care for

22

themselves.[7] (See *Qawi, supra,* 32 Cal.4th at p. 15.) If, by failure of enforcement—which is what was alleged and impliedly found here—the Director has placed the state's imprimatur on the nursing homes' challenged conduct, then that is also a sufficient ground to extend due process protection to nursing home patients.

We think the superior court was right to conclude that, looking at the statute literally, as written, section 1418.8 fails to meet due process requirements under article I, section 7, subdivision (a) of the California Constitution. A declaration of incapacity subjects the nursing home resident to grievous loss and must be accompanied by due process protections. Petitioners have presented evidence in this case that a declaration of incapacity not only deprives the nursing home resident of decisionmaking power over his or her own health care, but may result in loss of control over finances and freedom of movement. The superior court's findings amply support its determination that, as illustrated by Gloria A.'s circumstances, section 1418.8, on its face, is constitutionally deficient. In fact, in one critical respect—a patient's right to notice of entitlement to a patient representative on the IDT—we conclude the superior court's due process analysis did not go far enough.

### 2. *Construing Section 1418.8 to Save it From Constitutional Infirmity*

Presented with a petition for a writ of mandate seeking both declaratory and injunctive relief, the superior court elected to proceed by injunction. In prohibiting enforcement of section 1418.8 "to the extent that said section does not require" constitutionally required notice, the superior court recognized that nursing home residents who have been determined to lack decisional capacity are unlikely to understand or be able to act on such notice. It considered the privacy rights at stake to be so fundamental

---

[7] The amici favoring the Director disagree with petitioners that the IDT derives its power from the state acting in *parens patriae*. They claim an IDT operates as a surrogate decisionmaker for the resident on the basis of the resident's consent. To the extent the Director adopts this view, we disagree. An IDT is not a true surrogate selected by the patient; the IDT derives its decisionmaking authority only from section 1418.8, and therefore it must be considered a substitute decisionmaker selected by the state.

23

and the consequences of erroneous deprivation so potentially harmful to the patient, that state standards of due process require, at a minimum, written notice of the four listed categories of information.

While we agree in principle with the superior court's due process analysis, we think the proper remedial approach here is to preserve the statute's constitutionality by interpretation, not to prohibit its enforcement by injunction. Legislation comes to us clothed with a presumption of validity, and when dealing with a challenge to a statute, whether facial or as applied, our mission is, "wherever possible, . . . [to] interpret . . . [the challenged] statute as consistent with applicable constitutional provisions, seeking to harmonize Constitution and statute." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 594 (*Elliott*); see *Syrek v. California Unemployment Ins. Appeals Bd.* (1960) 54 Cal.2d 519, 526 [" 'The power of a court to declare a statute unconstitutional is an ultimate power; its use should be avoided if a reasonable statutory construction makes the use unnecessary.' "]; *Ashwander v. Tennessee Valley Authority* (1936) 297 U.S. 288, 346 (conc. opn. of Brandeis, J.).)

In rejecting a due process challenge to section 1418.8, the *Rains* court relied upon the fact that the statute does not stand in isolation, but operates within a complex regime of overlapping state and federal statutes and regulations establishing the rights of nursing home residents. (*Rains*, *supra*, 32 Cal.App.4th at pp. 186-187.) This background regime—triggered at the time of admission to a nursing home[8]—entitles residents (1) to be "fully informed" about their "total health status";[9] (2) to "consent to or refuse any treatment or procedure";[10] (3) to receive "all information that is material" to the decision

---

[8] California Code of Regulations, title 22, section 72527, subdivision (a)(1); title 42 United States Code section 1395i-3(c)(1)(B)(i); 42 Code of Federal Regulations part 483.10(b)(1) and (2).

[9] 42 Code of Federal Regulations part 483.10(c)(1).

[10] California Code of Regulations, title 22, section 72527, subdivision (a)(4).

whether to accept or refuse any treatment or procedure;[11] (4) to participate in their overall "plan of care, including the identification of medical, nursing and psychosocial needs and the planning of related services";[12] (5) to be "immediately inform[ed]" when there is a significant change in their "physical, mental, or psychosocial status," or a "need to alter treatment significantly";[13] and (6) to be informed that they "have the right to voice grievances to facility personnel free from reprisal and can submit complaints to the State Department of Health Services or its representative."[14]

Describing the statutory and regulatory backdrop as one "designed to protect nursing home patients" through a set of "standards and regulations . . . which both limit and supplement the interdisciplinary team decisionmaking approach by granting certain rights and safeguards to affected residents" (*Rains*, *supra*, 32 Cal.App.4th at p. 186), the *Rains* court concluded that "[c]onsideration of these numerous statutory safeguards [citation] undermines the claim that section 1418.8 violates due process standards." (*Id.* at pp. 186-187.) We draw a different conclusion, on a different rationale. In our view, the Legislature built section 1418.8 on a preexisting foundation of patient protections that it expected would be necessary for the implementation of the statute. Rather than "undermine" petitioners' due process claim, we think this legal backdrop confirms that the Legislature understood and intended there were certain bedrock procedural minima on which it was establishing a new scheme. The gravity of the interests at stake outside the context of "routine, day-to-day" medical decisionmaking convinces us that—at least

---

[11] California Code of Regulations, title 22, section 72527, subdivision (a)(5).

[12] California Code of Regulations, title 22, section 72527, subdivision (a)(3); accord title 42 United States Code section 1395i-3(c)(1)(A)(i).

[13] 42 Code of Federal Regulations part 483.10(g)(14)(B) and (C).

[14] Health and Safety Code section 1599.2, subdivision (c); accord title 42 United States Code section 1395i-3(c)(1)(A)(vi).

with respect to notice and an opportunity to be heard—this assumed procedural foundation is not just statutory and regulatory, but constitutional.

Faced with the choice of voiding a statute or reading it to include procedural protections to avoid constitutional infirmity, courts have often chosen the route of savings-by-interpretation. (See *Elliott*, *supra*, 17 Cal.3d at p. 594; see also *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616 [construing statute to require "reasonable notice and opportunity to be heard"]; *Braxton v. Municipal Court* (1973) 10 Cal.3d 138, 144-145 [noting that statute "must be construed so as not to violate the precepts of procedural due process; hence we interpret [statute] to require notice and a hearing"]; *Board of Education v. Mass* (1956) 47 Cal.2d 494, 499 [reading hearing and other requirements into statute where law could "be reasonably interpreted in a manner consistent with due process"]; *Charles S. v. Board of Education* (1971) 20 Cal.App.3d 83, 94-96 [denying writ challenging constitutionality of statute on procedural due process grounds, and construing statute to include specific notice and hearing requirements].)

We agree with the superior court that unbefriended nursing home patients who are perceived to lack decisionmaking capacity must receive "adequate notice" of the incapacity decision, the absence-of-a-surrogate decision, any recommendation for treatment by the IDT, and the right to judicial review. Without mandated notice of these matters to patients, in our view, the respect for personal autonomy that it is the central objective of section 1418.8 to protect is essentially meaningless. As the superior court explained, "[t]o the extent . . . patients [covered by section 1418.8] are competent enough to want to challenge . . . determinations" made for and about them, "notice and opportunity may allow them to keep their decision-making capacity, or designate someone of their own choosing, instead of placing such decisions in the hands of a team of strangers." At stake, fundamentally, is the right of individual dignity. "If, in fact, the patient lacks capacity," the superior court pointed out, "then the patient will likely be unable to understand the nature of these determinations or to seek review," but at least "will have been afforded his or her due process rights." We take the same view, but rather than bar enforcement of section 1418.8 because it makes no express provision for

26

notice and an opportunity to be heard, we imply these requisites as a matter of statutory interpretation and constitutional imperative.

### 3. *Adequacy of Notice*

Although we conclude the superior court's due process analysis was correct, in some respects it did not go far enough. Beyond requiring written notice of certain kinds of information, for example, the court did not expound on what "adequate notice" means in this context. When notice is required, it must be reasonably calculated to give actual notice to the person affected. (*Rasooly v. City of Oakley* (2018) 29 Cal.App.5th 348, 357.) We are concerned here with effective notice, that is, notice that will result in communication to the resident, if possible. If notice is to be effective in these circumstances, it must be given in writing as well as orally. This seems only marginally more burdensome than oral notice alone and is much more likely to lead to the patient's understanding of his or her own predicament because (1) it may be referred to repeatedly for increased comprehension, and (2) it may be shown to a friend, relative, nursing home staff member, or local ombudsman[15] for a simpler or fuller explanation of what the writing seeks to convey.

But requiring notice to affected residents, by itself, is not sufficient. This is a population that, by definition, will include many people who lack the ability to

---

[15] The California Long-Term Care Ombudsman is an organization created in response to federal legislation. (42 U.S.C. § 3058g.) Its role is to monitor nursing homes, to take, investigate, and resolve complaints from nursing home residents, and to report to the Department its findings and recommendations. (See Welf. & Inst. Code, § 9712.5, subd. (b) [State Ombudsman is authorized to "[p]rovide services to assist residents in the protection of their health, safety, welfare, and rights"].) CLTCOA is an association of local long-term care ombudsman programs in California. As such, its members are charged with monitoring nursing homes throughout California for compliance with patient rights. (Welf. & Inst. Code, § 9712.5, subd. (a); 42 U.S.C. § 3058g(a)(3)(A).) CLTCOA therefore purports to reflect the views of those who regularly frequent nursing homes in California and observe their operation, offering us "boots on the ground" insight into the IDT process as it is used in nursing homes throughout California.

comprehend complex written expression.[16]  Notice to an incompetent person alone does not comport with due process.  In *Covey v. Town of Somers* (1956) 351 U.S. 141, where notice of a judicial foreclosure for delinquency in paying real property taxes was sent to a property owner, who the authorities knew was mentally incompetent and unable to understand the meaning of any such communication, the Supreme Court held, "Notice to a person known to be an incompetent who is without the protection of a guardian does not measure up to this requirement [of due process]."  (*Id.* at p. 146.)  Applying the holding in *Covey* under article I, section 7 of our Constitution, we think due process requires that steps be taken to notify an incompetent person in a way that provides the person access to assistance in comprehending what he or she is being told.

Hence, we conclude the superior court's order in this case requiring written notice to the resident alone did not go far enough to remedy the due process problem.  Given the health circumstances of the intended recipients, we hold that written notice must also be given to at least one competent person who might be willing and able to discuss the meaning of the notice to the resident.  The patient representative or the local ombudsman provided for in section 1418.8, subdivisions (e) and (f) could, for instance, receive such notice on the patient's behalf.  Anyone empowered by the Probate Code to pursue judicial relief for the resident, even if they are not available to serve as a surrogate decisionmaker, might suffice.  (See also Prob. Code, § 3203 [listing persons entitled to pursue judicial remedy under Prob. Code, § 3201 on patient's behalf].)

4. *Composition of IDT*

Viewing *Rains* as dispositive on the point, the superior court declined to rule that a constitutionally required element of due process for nursing home patients subject to

---

[16] See Dinerstein, *Implementing Legal Capacity Under Article 12 of the UN Convention on the Rights of Persons with Disabilities:  The Difficult Road from Guardianship to Supported Decision-Making* (2012) 19 Hum. Rts. Brief 8, 10-11 ("persons with disabilities may need assistance in decision making through such means as interpreter assistance, facilitated communication, assistive technologies, and plain language").

section 1418.8 is that they be notified of their entitlement to have a patient representative serve on the IDT. On this point, we think more is required than the holding in *Rains* demands. As noted, section 1418.8, subdivision (e), provides for the participation of a patient representative on the IDT "where practicable." The Legislature defined "patient representative" broadly: "A patient representative may include a family member or friend of the resident who is unable to take full responsibility for the health care decisions of the resident, but who has agreed to serve on the interdisciplinary team, or other person authorized by state or federal law." (§ 1418.8, subd. (f).) According to *Rains*, patient representatives may include "patient advocates, legal counsel, and all other persons having an interest in the welfare of the patient," as well as the public guardian or a local ombudsman. (*Rains*, *supra*, 32 Cal.App.4th at p. 182.)[17]

*Rains* took the broad statutory definition as a sign that practically no patient would be unrepresented on an IDT, finding it "almost impossible to conceive of a patient who could not have a patient representative." (*Rains*, *supra*, 32 Cal.App.4th at p. 182.) The *Rains* court envisioned that a resident would be deprived of a patient representative only in rare circumstances, such as "due to [the patient representative's] temporary unavailability, illness, or similar causes." (*Id.* at p. 167.) *Rains* also found it "highly significant that section 1418.8, subdivision (e) *requires* a patient representative" as a member of the IDT in rejecting the due process challenge to section 1418.8. (*Rains*, *supra*, 32 Cal.App.4th at p. 166, italics added.) In fact, to render the statute constitutional, we hold that a patient representative independent of the nursing home

---

[17] The record evidence in this case is mixed as to how local ombudsmen, to date, have viewed their role. Two local ombudsmen filed declarations indicating, as ombudsmen, they were not allowed to vote on an IDT or act as a patient representative, although they sometimes sat in on IDT's as non-voting participants. The Director and CMA claim there is no legal impediment to their serving as patient representatives, and the declaration of one local ombudsman states that she acted as the resident's "advocate" on one IDT. CAHF reports: "Long-Term Care Ombudsmen, who are required to investigate and resolve reports of abuse in these facilities, are not legally authorized to assume the role of health care decisionmakers." (Enrolled Bill Report, Department of Aging (June 28, 1996), at p. 1.)

29

must be identified for participation on every IDT and must participate on the IDT, except in emergencies.

*Rains* also construed the statute as mandating that the patient representative alone would actually make the treatment decision; the medical staff on the IDT would make the decision only in exigent circumstances when the patient representative was unavailable or unwilling: "[W]e deal with a statutory procedure by which the *equivalent of informed consent may be provided, by a patient representative* if practicable, and in exigent circumstances by health professionals . . . ." (*Rains, supra,* 32 Cal.App.4th at pp. 185-186, italics added.)[18] We read the statute somewhat differently. (Compare *Rains, supra,* 32 Cal.App.4th at pp. 184-186 with § 1418.8, subd. (e).) Although the patient representative's consent is required as part of the IDT, his or her vote on the team is but part of the required consensus; holding that the patient representative alone could control decisionmaking would be tantamount to making the representative the surrogate decisionmaker for the resident, though he or she has not qualified for or is unwilling to assume that status and may not have been chosen by the resident. A patient representative is defined, in part, as a family member or friend who is "unable to take full responsibility" for making the resident's health care decisions (§ 1418.8, subd. (f)) and therefore does not perform the role of a surrogate.

Because the threshold determination triggering the need for an IDT requires that there be no one "with legal authority to make" health care decisions on the patient's "behalf," we understand the patient's representative designated to serve on the IDT as something different from a surrogate decisionmaker. (§ 1418.8, subd. (a).) Where a patient, although incompetent to make medical decisions, nonetheless is able to articulate coherent ideas about his or her current circumstances, it is the task of the patient representative to bring that information into the IDT's decisionmaking process. Viewed

---

[18] Petitioners argued in the superior court that this role was not being adhered to as the statute was applied in nursing homes, but the court held their evidence was insufficient to show that patient representatives were routinely omitted from participation on IDT's.

30

in that light, the role of the patient representative on the IDT is to take responsibility for understanding and articulating the best approximation possible of the patient's perspective. In effect, as we read the statute, the Legislature has provided for virtual representation through the IDT as a body, not actual representation through the patient representative.

It may be that, as a practical matter, the patient representative is the member of the IDT whose perspective comes the closest to being a stand-in for the patient—and perhaps is the one most likely to dissent, since it is the decision of the attending physician that is under review by the IDT. Nevertheless, we do not view the role of the patient representative as a proxy for the patient, in the sense of an advocate or an agent who takes guidance or instruction from a client or principal. The context here, a setting in which the patient cannot express his or her informed decision to anyone, makes that impossible. Where the patient's attitudes and personal background are not known, the patient representative provides, at minimum, the perspective of an individual unaffiliated with the nursing home, who can be vigilant as to when judicial intervention is required.

As the IDT member uniquely responsible for presenting the patient's perspective, the patient representative's role on the IDT is essential. Despite the crucial function performed by the patient representative, the statutory language "where practicable" (§ 1418.8, subd. (e))—if given a broad reading—would severely undervalue the right to have such a person involved in the IDT's decisionmaking process. We consider it necessary to have a patient representative participate on *every* IDT as an element of due process. "Where practicable" does not mean "where convenient" or "where someone happens to step forward." The statute imposes upon the nursing home an affirmative duty to investigate who might serve as patient representative, and if no family or friend is available, the nursing home must designate some person not employed by the nursing home—and thus independent of nursing home staff—to act as patient representative.[19]

---

[19] To reinforce the independence of anyone who serves as a patient representative, and perhaps to facilitate the formation of a professional community willing to carry out this crucial function, the Legislature might wish to consider enacting supporting

31

As *Rains* held, the phrase "where practicable" allows the IDT to proceed without a patient representative only in "exigent circumstances" when the urgency of the patient's medical needs will not allow for the patient representative's participation. (*Rains*, *supra*, 32 Cal.App.4th at pp. 166-167.) Nursing homes may not use the "where practicable" language as an escape valve to avoid participation by a patient representative. A patient representative should be designated for each resident determined to be decisionally incapacitated as soon as that determination is made. Where no appropriate friend or family member is identified, the nursing home must enlist the local ombudsman, public guardian, or equivalent county officers to serve. (See Prob. Code, § 3203.)

It is clear to us, as it was to the panel in *Rains*, that the Legislature intended to give nursing home residents something as close as possible to a voice on any IDT convened to make a determination about the resident's health care, and that voice was to be communicated through a "patient representative." (§ 1418.8, subd. (e).) Because the resident has a statutory *right* to the participation of a patient representative in the IDT process, the notice that we require in parts IV.D.2. and IV.D.3., *ante*, must include notice of that right. Only through vigorous enforcement of the right to have a patient representative serve on the IDT may the resident's due process rights under our state Constitution be protected and effectuated.

### 5. *Timing Considerations*

#### a. Timing of Notice

Petitioners' cross-appeal presents the question whether the due process clause of the state Constitution requires more than the relief the superior court provided, whether it requires notice of the proposed declaration of incapacity *prior to* the physician making the capacity decision, and likewise requires notice of the proposed lack of surrogate

---

incentives and protections for people who are designated to serve in that role. Among the things that might be considered, for example, are (1) a scheme of funding to compensate them and to support training and education in the skills required to carry out their professional role, and (2) statutory immunity from civil liability.

finding before that finding is made. (See *Goldberg v. Kelly* (1970) 397 U.S. 254, 261, 264-265 [requiring hearing before termination of welfare benefits, rather than after].)

Petitioners' argument is that without *prior* notice, the right to oppose these decisions in court afterward is ineffective, in part because it would reverse the burden of proof. (Cf. *Doe v. Gallinot* (9th Cir. 1981) 657 F.2d 1017, 1022.) They also posit the patients' feeble health and limited intellectual capacity are obstacles to filing a petition in court challenging the attending physician's incapacity determination. Petitioners also contend that notice must be accompanied by an opportunity to oppose the incapacity decision *before* it is made. They insist such a hearing must provide residents with the usual accompaniments to an adversarial hearing, including the resident's right to counsel or a counsel substitute.

We must reject petitioners' contentions as to timing as being beyond the minimum requirements of due process. We can agree with them that giving notice before a capacity decision is made would maximize protection of the patient's constitutional rights, and providing for a process more closely resembling an adjudication might increase that protection still further, but the question is whether the Legislature is required to provide that degree of protection as a matter of constitutional imperative.

In *Goldberg v. Kelly* the Supreme Court's concern about the impact on individuals affected by the state action necessitated a pre-termination hearing for welfare recipients, for they would suffer a grievous loss if their benefits were cut off while awaiting the post-termination hearing afforded by the state. (397 U.S. at pp. 260-264.) The difference in circumstances makes it far more likely here that the treatment delays that would accompany a hearing prior to the capacity determination would work to the serious harm of nursing home residents needing immediate medical intervention. (*Rains*, *supra*, 32 Cal.App.4th at pp. 181-182.) The very point of enacting section 1418.8 in 1992 was to establish a fair but streamlined procedure to be used in cases of incapacitated residents without family or friends to make health care decisions on their behalf. To require, as a matter of due process, all the features of a judicial proceeding would undermine the

33

fundamental purpose of the statute, which was to avoid the complications and delays inherent in the judicial procedure established by Probate Code section 3200 et seq.

Timing constraints make petitioners' proposed procedure infeasible. Notice immediately following a doctor's determination of incapacity, with an opportunity for judicial review before treatment begins, satisfies due process. Although the statute provides no opportunity for the resident to oppose the incapacity decision before it is made, and no administrative review procedure separate from the IDT, it does allow for judicial review of the incapacity and surrogacy decisions. This complies with the requirements of due process. The statute presupposes the patient needs a medical procedure or prescription, presumably on a relatively short timetable. (§ 1418.8, subd. (a).) There is no requirement for a standalone capacity determination.[20] When the capacity determination is made contemporaneously with a treatment recommendation, the patient's needs generally will not allow for an adjudicative hearing in every case. Nor must we presume that every recommended procedure or every incapacity finding will be opposed by the resident.

The Director's amici argue that a ruling by this court requiring a judicial determination in each case, as a matter of course, would result in lengthy delays, and patients would go without needed medicine or medical procedures, resulting in suffering and possible death while waiting for a court ruling on capacity. Especially if antipsychotics cannot be prescribed by an IDT, they predict more nursing home patients will end up in mental hospitals. Additionally, more nursing home patients would have to be admitted to hospitals or urgent care facilities because their health problems would turn into emergencies while awaiting judicial action. Ultimately, the Director argues, nursing homes may refuse to accept patients subject to decisionmaking under section 1418.8 because they may believe they would be unable to tend to the patient's medical needs

---

[20] Despite the wording of the statute, the evidence submitted by petitioners included declarations by ombudsmen suggesting that capacity determinations are routinely made upon the patient's first entry into the nursing home, regardless of whether there is any immediate need for informed consent, and the CMA agrees.

34

timely and responsibly. Hence, the Director and her amici predict, if we were to agree with petitioners' arguments, this most vulnerable population would run the risk of being confined to acute care facilities or hospitals or left without a viable means of securing medical care.

Petitioners clarify that a full-blown judicial proceeding such as that involved in Probate Code section 3201 is unnecessary, but rather the Constitution would be satisfied by an administrative board or a hearing procedure presided over expeditiously, such as the administrative hearings put into operation by the Legislature following the decision in *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1318. (See Welf. & Inst. Code, § 5332.) Such a hearing, they suggest, could be conducted by "a court-appointed commissioner or referee, or a court-appointed hearing officer" (Welf. & Inst. Code, § 5334, subd. (c)), and therefore need not be made by a judge. This added protection, in our view, would dispense with the IDT structure altogether. Petitioners want to throw out the baby with the bath. Nothing so drastic is required. Pitted against the argument that time is of the essence in medical decisions, the preference for prior notice and an opportunity to resist the determination before it is made must give way to efficacy of the proposed intervention.

> b.      Timing of Recommended Medical Interventions

As we view the statute, there is an opportunity to be heard in court upon a petition under Probate Code section 3201 if the collaborative model of decisionmaking results in deadlock (i.e., if anyone on the IDT disagrees with the incapacity or lack of surrogacy determinations or the proposed treatment). Petitioners point out that, for incapacitated persons, providing for a remedy in superior court is unrealistic and impractical due to their physical and mental health challenges. Because individuals other than the patient may initiate such proceedings (Prob. Code, § 3203), and because the procedure employed on judicial review would include appointment of counsel for the resident (Prob. Code, § 3205), we see no lack of due process in the procedure provided, so long as the

35

implementation of the proposed treatment is delayed until after any judicial challenge has been decided (with the exception of cases of emergency).

The opportunity to be heard must be provided at a meaningful time and in a meaningful manner. (*Goldberg v. Kelly*, *supra*, 397 U.S. at p. 267; *Armstrong v. Manzo*, *supra*, 380 U.S. at p. 552.) Unless implementation of the physician's recommended treatment is postponed until after a collaborative decision has been made by the IDT or judicial review has been completed, the medical procedure may have already been completed before the patient may realistically oppose the incapacity determination and the proposed medical intervention in court. This is why we conclude that, except in emergencies, to give nursing home residents a meaningful opportunity to be heard, the IDT's decision on implementing treatment must be postponed until after notice has been given, and the treatment may not begin until after the resident has had an opportunity to seek judicial review.

Section 1418.8, subdivision (e) provides that the IDT must "review . . . the prescribed medical intervention" before it is implemented. There is no language in section 1418.8 either specifically authorizing or specifically prohibiting the IDT from reviewing capacity determinations, but the Director presented evidence in the superior court that IDT's can and do review capacity and surrogacy determinations, as well as medical treatments. This, she claims, is part of reviewing the patient's overall "condition" as prescribed in section 1418.8, subdivision (e)(1). Adopting that construction of the statute, we find the IDT process serves as a more expeditious, and constitutionally sound, alternative to judicial review, so long as a patient representative is included on the IDT.

### E. Facial Challenge on Cross-Appeal: Who Decides Capacity, Judge or Doctor?

#### 1. *The Requirement of a Judicial Determination of Decisional Capacity*

Petitioners contend in their cross-appeal that a physician cannot lawfully decide whether the patient has decisional capacity because the question of capacity is inherently

36

a legal one, not a medical one. (*Qawi*, *supra*, 32 Cal.4th at p. 17.) Because section 1418.8 places that decision in a physician's hands, petitioners contend it violates the resident's privacy rights under article I, section 1 of the California Constitution. Even worse, they point out, the decision under section 1418.8, subdivision (a) rests with the attending physician, whom they consider a non-neutral party,[21] who also participates on the IDT (§ 1418.8, subd. (e)), which they contend deprives the patient of a neutral decisionmaker in violation of due process.

Petitioners suggest, because section 1418.8 lacks a judicial determination of incapacity as part of its procedure, the statute violates California's privacy guarantee. (Cal. Const., art. I, § 1.) They contend the superior court's declaration of unconstitutionality of section 1418.8 did not go far enough because it did not declare a determination of incapacity by a treating physician was unconstitutional. In response, the Director claims the entire procedure described in section 1418.8 calls for the making of medical decisions, not legal decisions. She finds some support in *Washington v. Harper*, where the Supreme Court took no issue with the lack of a judicial hearing as to the need for antipsychotic medication because it considered such matters best assessed by medical professionals. (*Washington v. Harper*, *supra*, 494 U.S. at pp. 231-233.) *Rains*, too, adopted this reasoning. (*Rains*, *supra*, 32 Cal.App.4th at pp. 184-185.)

In its June 2015 order, the superior court noted that section 1418.8 does not "provide the same procedural safeguards found in *Washington* [*v. Harper*] requiring an independent decisionmaker. Instead, section 1418.8[, subdivision] (e) requires the same attending physician [who] determined the patient to be incompetent to be a part of the IDT that reviews that physician's prescribed medical intervention prior to administration of the medical intervention." Nevertheless, the superior court did not hold our

---

[21] Petitioners portray attending physicians as being almost adversarial to the residents. They insist upon their right to a "neutral" decisionmaker, casting attending physicians as anything but that. We, like *Rains*, fail to share petitioners' cynicism. We cannot "presume the bias if not dishonesty of physicians opining as to the patient's capacity." (*Rains*, *supra*, 32 Cal.App.4th at pp. 181-182.)

37

Constitution demands that nursing home residents be provided with an independent decisionmaker. It found the issue was decided by *Rains*.

We must determine whether the statute, on its face, violates the rights of nursing home residents. To assert a privacy violation, *Hill*, *supra*, 7 Cal.4th 1 requires three elements: "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Id*. at pp. 39-40.) The Director contends there is no violation of the patient's privacy rights because the IDT procedure does not constitute an "egregious breach of . . . social norms." (*Id.* at p. 37.) *Rains* agreed with that analysis (*Rains*, *supra*, 32 Cal.App.4th at pp. 174-177), but petitioners contend the Supreme Court's subsequent decision in *Qawi*, *supra*, 32 Cal.4th 1, which addressed whether mentally disordered offenders (MDOs) could be compelled against their will to be treated with antipsychotic medication, casts into doubt the central holding of *Rains*.

The Mentally Disordered Offender Act requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after termination of their parole until their mental disorder can be kept in remission. (Pen. Code, § 2960 et seq.) *Qawi* addressed whether the petitioner, an MDO who had finished his period of parole, could refuse antipsychotic medication for his mental disorder despite the statute authorizing continued medication. (*Qawi*, *supra*, 32 Cal.4th at pp. 9, 11.) In the MDO Act, the Legislature specifically provided that MDOs who have completed their term of parole retain the same rights granted to mentally ill patients that have been involuntarily civilly committed under the Lanterman-Petris-Short Act (LPS Act), found in Welfare and Institutions Code section 5000 et seq. (See Pen. Code, § 2972, subd. (g).)

Petitioners base their argument in large part on three sentences from *Qawi*, *supra*, 32 Cal.4th 1: " ' "Competence is not a clinical, medical, or psychiatric concept. It does not derive from our understanding of health, sickness, treatment, or persons as patients. Rather, it relates to the world of law, to society's interest in deciding whether an individual should have certain rights (and obligations) relating to person, property and

38

relationships." ' " (*Id*. at p. 17, quoting *Riese v. St. Mary's Hospital & Medical Center*, *supra*, 209 Cal.App.3d at p. 1321.) From this premise, petitioners argue the statute's placement of the decisionmaking about capacity with doctors rather than judicial officers deprives nursing home residents of their constitutionally-protected rights to make their own medical decisions.

We view the decision on incapacity as involving both medical and legal aspects: the decision on competency entails legal consequences and therefore may be considered primarily legal—as *Qawi* found—but it undeniably has a medical aspect as well. A person may become incompetent by reasons best explained medically. The legal conclusion is therefore based at least in part on medical evidence, subject to a standardized definition of incapacity in section 1418.8, subdivision (b), which supplies some safeguard against arbitrariness and caprice.[22] The determination of decisional capacity is, to be sure, increasingly recognized as a complicated undertaking, especially in patients with dementia. Petitioners' evidence, as well as briefing supplied by petitioners' amici, further shows that determination of incapacity is far from an exact science, that mistakes are made, and that capacity may vary from one context to another and from one time to another, often fluctuating with the specific circumstances a resident is in and the availability of someone who knows how to communicate effectively with him or her. Declarations by ombudsmen and others familiar with nursing home practices

---

[22] Physicians whose decisions on capacity were included in one study of 29 patients with mild Alzheimer's disease showed only 54 percent agreement among the doctors as to the capacity of the subjects to make their own medical decisions. (Marson et al., *Consistency of Physician Judgments of Capacity to Consent in Mild Alzheimer's Disease*, Journal of the American Geriatric Society (April 1997) Vol. 45, pp. 453-457; see also Moye, et al., *Neuropsychological Predictors of Decision-Making Capacity over 9 Months in Mild-to-Moderate Dementia*, J Gen. Intern. Med. (Jan. 2006) 21(1), pp. 78-83.) When a standardized definition of capacity was introduced, a comparable study showed doctors agreed 76 percent of the time. (Marson et al., *Consistency of Physicians' Legal Standard and Personal Judgments of Competency in Patients with Alzheimer's Disease*, Journal of the American Geriatric Society (August 2000) Vol. 48, pp. 911-918.)

recount instances of erroneous or questionable determinations of incapacity, as in Gloria A.'s case.

To convince us that the risk of error is so high that we should find a due process violation here, petitioners point to language in *Qawi*, *supra*, 32 Cal.4th 1 stating that "in order to give MDOs the same rights as LPS patients, an MDO can be compelled to take antipsychotic medication in a nonemergency situation only if a court, at the time the MDO is committed or recommitted, or in a separate proceeding, makes one of two findings: (1) that the MDO is incompetent or incapable of making decisions about his medical treatment; *or* (2) that the MDO is dangerous within the meaning of Welfare and Institutions Code section 5300." (*Qawi,* at pp. 9-10.) What they overlook is that our Supreme Court's decision in *Qawi* was based on statutory construction, not constitutional analysis. (*Id.* at pp. 13-14, 24-25.)

We are not persuaded that *Qawi* calls for a judicial determination of incapacity. Just because a capacity determination has some legal consequences does not mean it must be made by a judge in every circumstance. In this statutory setting, the physician's decision regarding capacity is guided by objective standards and requires an investigation regarding possible surrogacy and patient wishes. (§ 1418.8, subds. (b) & (c).) But the most fundamental distinction is that, by its establishment of an IDT and provision for the participation of a patient representative, section 1418.8 allows for an informal and expeditious method—based on a collaborative model of decisionmaking—to resolve any objections that might be expressed on the patient's behalf.[23] We conclude that so long as

---

[23] Section 1418.8 is not unique in providing for an alternative to the adversarial process as a decisionmaking model. For instance, the federal Individuals with Disabilities Education Act (IDEA) (20 U.S.C. § 1400 et seq.) employs a collaborative decisionmaking process for disabled students to achieve a free appropriate public education (FAPE). (See 20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(B).) "The premise of the IDEA is that parents and schools working together to design an IEP [individualized education program] is the ideal way to reach the statute's goal of a FAPE for every child. See *Ridley* [*School Dist. v. M.R.* (3d Cir. 2012)] 680 F.3d [260,] 269; see also *Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Congress anticipated, however, that 'the collaborative process' may at times break down. [Citation.] Hence, the Act allows either party to

the patient's viewpoint is represented within the collaborative decisionmaking process of the IDT, due process is not violated. The regulations implementing section 1418.8 allow for the physician to make the incapacity determination only where the patient representative raises no objection. If an objection is raised, the incapacity decision must be made by a court. (Cal. Code Regs., tit. 22, § 72527, subd. (c) ["The patient's incapacity shall be determined by a court in accordance with state law or by the patient's physician unless the physician's determination is disputed by the patient or patient's representative."].)

As *Rains* reasoned, the resident of a nursing home sacrifices a great deal of privacy by reason of the very circumstances that have placed him or her there. (*Rains*, *supra*, 32 Cal.App.4th at pp. 173-174.) Given their reduced expectation of privacy, *Rains* held, the incursions on nursing home residents' rights to self-determination of medical treatment are not so severe as to call for increased protection of nursing home residents. (*Id*. at pp. 172-177.) Given most especially the participation of a patient representative (§ 1418.8, subd. (e)) and the availability of judicial review (*id.*, subd. (j)), *Rains* held the minimum standards of due process are met and there is no unconstitutional incursion into residents' privacy rights. (*Rains*, *supra*, 32 Cal.App.4th at pp. 177, 182, 184, 187.) We agree with *Rains* in that respect.

To adopt petitioners' view—requiring a judicial determination for every case of incapacity in every nursing home in the state—would throw us back into the thick of the problem that led to the enactment of section 1418.8 in the first place. We could not find our way there through any form of statutory construction, for that result would be diametrically opposed to the Legislature's intent. We would be justified in imposing such a requirement on section 1418.8 only if it were a matter of constitutional imperative, and it is not.

---

respond to a stalemate in the discussions by requesting an impartial due process hearing before a state or local administrative officer. See 20 U.S.C. § 1415(f)." (*M.R. v. Ridley School Dist.* (3d Cir. 2014) 744 F.3d 112, 117.)

*Rains* rejected the idea that due process requires an adjudicative hearing to make an initial determination of incapacity. (*Rains*, *supra*, 32 Cal.App.4th at pp. 184-185.) "Capacity determination, which must be decided under section 1418.8 *before* required medical intervention is activated thereunder on potentially thousands of elderly nursing home patients in this state,[24] would thereby be delayed, as would such treatment. No case cited to us, or disclosed by our independent research, has suggested that procedural due process requires postponement of medical intervention for a nursing home patient who is found by a physician to lack capacity to consent thereto until, in each case, the medical capacity issue is separately decided in some adversarial hearing. [¶] . . . Prompt and effective medical treatment of these unfortunate citizens would be seriously jeopardized [by such a ruling]." (*Rains*, at pp. 181-182.)

*Rains* also observed that the Legislature was better able to "reflect a proper balance of social values at stake in this significant and difficult problem, and that it has done so in enacting section 1418.8." (*Rains*, *supra*, 32 Cal.App.4th at p. 182.) Thus, the Legislature, after conducting hearings and giving considerable thought to various options, elected to adopt a collaborative decisionmaking process rather than an adversarial one. *Rains* held due process was nevertheless assured because of the right to seek judicial review of a physician's determination of a patient's incapacity as well as to the medical intervention itself, pursuant to section 1418.8, subdivision (j). (*Rains,* at p. 182.) Thus, *Rains* held a judicial determination of decisional incapacity was not required, and the procedure prescribed under section 1418.8 did not violate a patient's due process rights. (*Rains,* at p. 184.)

---

[24] At the time section 1418.8 was enacted, it was expected to affect some 10,000 nursing home residents in California. (Assem. Com. on Human Services, Analysis of Assem. Bill No. 3209, May 5, 1992 (Reg. Sess. 1991-1992), pp. 2-3.) More recent legislative estimates suggest some 3,000 to 12,000 nursing home residents are subject to IDT decisionmaking under the statute. (Assem. Jud. Com. Analysis of Sen. Bill No. 481, July 11, 2017 (Reg. Sess. 2017-2018), p. 6.) CAHF estimates that some 6,000 to 12,000 current residents of nursing homes in California are subject to decisionmaking under section 1418.8.

With the exception of the notice issue previously discussed—where we build upon *Rains* in order to preserve section 1418.8's facial constitutionality—we embrace the *Rains* court's conclusion that an IDT decisionmaking framework comports with procedural due process (*Rains*, *supra*, 32 Cal.App.4th at p. 184), and we find no greater protection is necessary for nursing home residents under the privacy guarantee of the California Constitution. (*Rains,* at p. 178.) Nothing in *Qawi* convinces us *Rains* erred in its essential holding that the basic IDT procedure prescribed by section 1418.8 is constitutional.

### 2. *Petitioners' Argument to Exclude the Attending Physician as Decisionmaker on Capacity*

If the decision is to be made by someone other than a judicial officer, petitioners argue, it must at least be someone uninvolved in the treatment of the resident. They rely in part on *Washington v. Harper*, *supra*, 494 U.S. 210, where the United States Supreme Court found a state prison inmate's federal due process rights were not violated, even though he was forcibly medicated, because an independent medical board determined he was a danger to himself and others and the treatment was in his medical interest. (*Id.* at p. 229.)

In *Washington v. Harper*, *supra*, 494 U.S. 210, under the institution's policy, before administration of antipsychotic drugs could begin, an inmate who refused such medication was entitled to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the associate superintendent of the institution, none of whom could be, at the time of the hearing, involved in the inmate's treatment or diagnosis. (*Id.* at p. 215.) The policy also provided for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses. (*Id.* at p. 216.) If the committee determined by a majority vote that the inmate suffered from a mental disorder and was gravely disabled or dangerous, the inmate could be medicated against his will, provided the psychiatrist was in the majority. (*Id.* at pp. 215-216.) The Supreme Court found the provision of a neutral decisionmaking board significant in upholding the constitutionality of the prison's procedure. (*Id.* at pp. 233-235.)

Section 1418.8 does not provide for the same kind of independent decisionmaker, for the prescribing physician in California nursing homes makes an initial autonomous decision about the patient's incapacity, lack of a surrogate decisionmaker, and proposed treatment, and then is routinely included on the IDT that reviews those findings and the proposed treatment.[25]  (§ 1418.8, subds. (a) & (e).)  We do not agree that this role by the attending physician renders section 1418.8 unconstitutional.  "Due process is flexible and calls for such procedural protections as the particular situation demands."  (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481; accord *People v. Ramirez*, *supra*, 25 Cal.3d at p. 268.)

Like the *Rains* court, we will not assume bias or self-interest on the part of a treating physician.  (*Rains*, *supra*, 32 Cal.App.4th at pp. 181-182.)  Physicians are governed by standards of practice and ethical oaths that lead us to presume they act in what they perceive to be their patients' best interests.  They do not occupy the same role as the jailers who wanted to medicate a prisoner in *Washington v. Harper*, the welfare authorities who were terminating public benefits in *Goldberg v. Kelly* (1970) 397 U.S. 254, 271, or the parole officials who wanted to return a parole violator to prison in *Morrissey v. Brewer*, *supra*, 408 U.S. at pp. 485-486.  In those cases, there was by definition a preexisting relationship to some degree adversarial, whereas in the attending physician-patient context there should exist a relationship of trust or at least neutrality.  Petitioners have not shown otherwise.  (See *Washington v. Harper*, *supra*, 494 U.S. at pp. 233-234 [*Vitek v. Jones* (1980) 445 U.S. 480 and *Parham v. J.R.*, *supra*, 442 U.S. 584 identified as "previous cases involving medical decisions implicating similar liberty interests [in which] we have approved use of similar internal decisionmakers"].)

---

[25] Although the statute nominally requires the attending physician to serve on the IDT, amicus curiae CLTCOA tells us that, in practice, typically no physician actively participates on the IDT.

44

3. *Petitioners' Argument that an Attending Physician Should Not Sit on the IDT*

For the same reasons they contend an attending physician is non-neutral and cannot be a decisionmaker on capacity, petitioners argue that an attending physician should not be allowed to participate in reviewing his or her own recommended medical intervention in his or her own patient's case as a participant on an IDT. We reject this variation of petitioners' physician bias argument for the reasons just stated.

4. *Determination of Existence of Surrogate Decisionmaker*

Whether a surrogate exists for the resident is a purely factual question that can be answered through a legal proof process, or an investigative one, which in our view could be conducted and determined by medical personnel or by legal personnel. With statutory guidance on how to conduct a fair and thorough investigation aimed at identifying a surrogate decisionmaker (§ 1418.8, subd. (c)), treating physicians may be entrusted with making a determination following such an investigation. Our state Constitution offers no impediment on this ground, and the IDT process offers a meaningful review, followed by judicial review if the patient or his or her representative continues to resist a finding of no surrogate.

## F. Facial Challenge:  Additional Due Process Claims on Petitioners' Cross-Appeal

Petitioners argue, largely on the basis of *Washington v. Harper*, *supra*, 494 U.S. 210, that additional procedural protections must be incorporated into section 1418.8 in order to bring it in line with the demands of due process. In formulating their objections to section 1418.8, petitioners attempt to convert the particular features of one institution's policy described in *Washington v. Harper* into absolute minimum requirements for a panel of nonjudicial decisionmakers to pass constitutional muster in making medical decisions. Though the prison policy in *Washington v. Harper* was held to comply with federal due process, the Supreme Court in that case made no pretense of setting forth minimum standards for precise emulation by other institutions. (494 U.S. at pp. 228-236.) We must examine only whether the procedures established by our state Legislature

45

for medical treatment of nursing home residents comport with minimum due process standards of the state Constitution. (Cal. Const., art. I, § 7.)

Seeking a procedure more protective of patients' rights, petitioners suggest (1) the prescribing physician must not be allowed to participate on the IDT, (2) a patient should be provided with counsel or a counsel substitute in the determination of incapacity, and (3) the IDT is not allowed to review capacity and surrogacy decisions. Petitioners thereby attempt to engraft onto the statute an adversarial process, presided over by a judge, with two sides, each represented by counsel, taking opposing positions and entrusting resolution of their disagreement to a neutral judicial officer.

We have already rejected petitioners' first argument for the reasons stated in parts IV.E.2 & IV.E.3., *ante*. Petitioners' third point we resolve by holding that an IDT does have the authority to review an attending physician's capacity and surrogacy decisions. Given the requirement that it review medical interventions quarterly (§ 1418.8, subd. (g)) and the fact that capacity fluctuates, the IDT presumably will revisit the incapacity determination at the time of its quarterly reviews. The Director presented evidence that the statute has been construed to allow the IDT that power, and we adopt that interpretation as consistent with, though not compelled by, the statutory language. We find no due process violation in the Legislature's choice to provide nursing home residents with an informal, collaborative decisionmaking process for determining medication needs.

Nor are we persuaded that nursing home residents facing an incapacity determination must be provided with some form of legal representation. Here again petitioners presuppose that a resident perceived to lack decisional capacity must have input before the capacity determination is made. We have determined that notice after the determination, coupled with the availability of judicial review, satisfies due process. If the resident or someone on his or her behalf (Prob. Code, § 3203) were to challenge the incapacity determination through a petition under Probate Code section 3201, counsel would be appointed at that stage. (Prob. Code, § 3205.)

Given our holdings that the IDT process does not itself offend the Constitution and that IDT's may reconsider the attending physician's determination of incapacity, we reject the notion that legal counsel must be appointed to help deal with that issue, whenever it arises.  The Legislature sought to eliminate from the process the time-consuming and adversarial nature that the participation of attorneys tends to entail.  Instead, it provided that residents would have a patient representative serve on an IDT.  (§ 1418.8, subds. (e), (f).)  The inclusion of a patient representative in a collaborative decisionmaking process, as we have explained, is enough to satisfy due process in this context.  (See, e.g., *Washington v. Harper*, *supra*, 494 U.S. at p. 236 ["lay adviser" familiar with medical issues was adequate for purposes of subjecting prison inmate to forced medication].)

## G. As-Applied Challenge:  Use of Section 1418.8 in Prescribing Antipsychotic Medication

### 1. *The Nature and Dangers of Antipsychotic Medications*

Although antipsychotic drugs have been recognized to have considerable benefit to mentally ill patients, they also have severe side effects, including some reversible conditions, some irreversible, and even on rare occasions, sudden death.  (*Qawi*, *supra*, 32 Cal.4th at pp. 14-15; *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 531 (*Keyhea*); *Washington v. Harper*, *supra*, 494 U.S. at pp. 229-230.)  Antipsychotics " 'also possess a remarkable potential for undermining individual will and self-direction, thereby producing a psychological state of unusual receptiveness to the directions of custodians.' " (*Keyhea*, at p. 531.)  For this reason, authorities often seek to medicate prisoners and others under their control, and those subject to such medication often object.  In light of the grave consequences of administering these antipsychotic drugs, courts have recognized that MDOs, as well as state prisoners threatened with forcible administration of antipsychotics, have procedural rights before they may be administered these drugs against their will.  (*Qawi*, at pp. 20-21, 27-28; *Keyhea*, at pp. 541-542;

*Washington v. Harper*, at p. 236.)  The exact procedures required may vary from one context to another.  (*Morrissey v. Brewer*, *supra*, 408 U.S. at p. 481.)

       2.  *Antipsychotics as Prescribed in Nursing Homes*

According to the Director and her supporting amici curiae, the administration of antipsychotics to nursing home residents proceeds much as described in section 1418.8, such drugs are extremely beneficial to the many nursing home patients who need them, and their use may be considered "nonintrusive" and "routine" in nursing homes.  (See *Rains*, *supra*, 32 Cal.App.4th at p. 186.)  Health and Safety Code section 1418.9 specifically authorizes the prescription of antipsychotics to a nursing home patient after seeking the consent of the resident and notifying "an interested family member," and so long as the resident does not object.  (Health & Saf. Code, § 1418.9, subds. (a), (b) & (d).)  That provision is evidently intended for patients not subject to IDT decisionmaking under section 1418.8.  The population subject to IDT decisionmaking often would have no "interested family member" and so no notice would go out on their behalf.  Once again, a third party should also receive notice on behalf of the resident.

The Director and her amici point out the broad purposes of section 1418.8, namely to "secure, to the greatest extent possible, health care decisionmakers" for unrepresented residents lacking decisionmaking capacity "to ensure that the medical needs of nursing facility residents are met even in the absence of a surrogate health care decisionmaker." (Stats. 1992, ch. 1303, § 1(c), p. 6327.)  They claim the protections built into section 1418.8, together with other protections in the regulatory environment, are sufficient to satisfy the residents' constitutional rights to autonomy privacy and due process.  They also point out that more modern atypical antipsychotics have fewer side effects and are now frequently used in nursing homes because they can be administered orally instead of by injection.  (*Qawi*, *supra*, 32 Cal.4th at p. 15.)  These newer medications are also

controversial for use in institutional settings, however, because administration requires patient cooperation.[26] (*Qawi*, at p. 15.)

Petitioners and their amici tell a decidedly different tale. They begin with the fact that the "attending physician and surgeon" referenced in section 1418.8 is frequently the nursing home's medical director. The attending physician is, at any rate, usually assigned to the resident, not chosen freely by the resident. (*In re Conroy*, *supra*, 486 A.2d at p 1237.) As the medical director, the attending physician has a financial interest in medicating patients with antipsychotics: by medicating them into a more complacent state, whether in their best medical interests or not, the nursing home can manage the facility's population with fewer employees, thus increasing the facility's profit.

Studies have shown that residents of nursing homes tend to be overmedicated with antipsychotics. (E.g., Alice F. Bonner, *Rationales That Providers and Family Members Cited for the Use of Antipsychotic Medications in Nursing Home Residents with Dementia* (2015) 63 J. Am. Geriatrics Soc'y. 302, 302; Jan Goodwin, *Antipsychotics Overprescribed in Nursing Homes*, AARP BULLETIN (July/Aug. 2014) <https://www.aarp.org/health/drugs-supplements/info-2014/antipsychotics-

---

[26] According to one of the declarations submitted by the Director in opposition to petitioners' motion for writ of mandate, that of Dr. Karl Steinberg, past-President of the California Association of Long Term Care Medicine, and Chief Medical Officer of Shea Family Health, which operates eight skilled nursing facilities in San Diego County: "[I]f section 1418.8 protection for unbefriended, incapacitated nursing home residents were taken away from residents suffering from psychotic episodes or self-injurious behavior, this would result in a great deal of unnecessary distress for patients, and often lead to more traumatic and expensive care. . . . Losing the protection of [section] 1418.8 would in all probability create a 'revolving door' for these unfortunate residents who would require trips to the hospital every time their behavior became sufficiently disturbing to the other residents, or dangerous to themselves or others, after diligent non-pharmacological measures had failed to calm them down. . . . This would present the distressed and disoriented resident with a bewildering set of unpleasant experiences, from being strapped and restrained on a gurney, ambulanced to the hospital, strapped and restrained on a gurney in the emergency room, being given antipsychotic medication there to calm them down (informed consent not being necessary in those circumstances), and usually in much higher doses than recommended for geriatric patients . . . ."

overprescribed.html> [as of July 22, 2019].)  This is a special concern not only because of the severe side effects ordinarily associated with these drugs, but because the effects are much more detrimental in elderly patients (Prakash S. Masand, *Side Effects of Antipsychotics in the Elderly* (2000) 61 J. Clinical Psychiatry 43, 43), and those over age 65 make up nearly 85 percent of the population in nursing homes nationwide. (<https://www.cdc.gov/nchs/data/series/sr_03/sr03_038.pdf>, p. 35 [as of July 22, 2019].)

The Director argues, however, that such problems have been recognized and addressed, and abuse of antipsychotics in nursing homes has sharply declined in recent years.  Current data indicate that as of the fourth quarter of 2018, antipsychotic use has been reduced to 11.1 percent of California nursing home residents, a 48.5 percent reduction since 2011.  (Centers for Medicare and Medicaid Services (CMS), *National Partnership to Improve Dementia Care in Nursing Homes: Antipsychotic Medication Use Data Report, Quarterly Prevalence of Antipsychotic Use for Long-Stay Residents, States* (April 2019) <https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Antipsychotic-Medication-Use-Data-Report.pdf> [as of July 22, 2019].)  This represents the fourth lowest prevalence of use among the 50 states.  (*Ibid*.)  The statewide prevalence of 11.1 percent is well below the national average of 14.6 percent.  (*Ibid*.)  Thus, the Director argues, past abuse provides no legitimate reason for declaring nursing home residents to have special due process protections in the administration of antipsychotics, where the regulatory system already rigorously controls the use of antipsychotics in nursing homes.  As for the risks involved with antipsychotics, the Director points out that other common medications, such as insulin and blood thinners, are riskier and have been connected with far more adverse events and deaths than antipsychotics.

3.  *The Regulatory Environment*

Through the Nursing Home Reform Act, which applies to almost all California

nursing homes,[27] and its implementing regulations, the federal government has sought to reduce over-prescription of psychotherapeutic drugs by explicitly limiting their use in nursing homes. The law expressly provides that psychopharmacologic drugs may be administered to nursing home residents only on the orders of a physician as part of a written plan of care "designed to eliminate or modify the symptoms for which the drugs are prescribed," and only if, at least annually, an "independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs." (42 U.S.C. § 1395i-3(c)(1)(D).)

The law also provides that nursing home residents have a right to be free from "chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." (42 U.S.C. § 1395i-3(c)(1)(A)(ii).) Such restraints may only be imposed "to ensure the physical safety of the resident or other residents," and "only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used," except in emergencies. (*Ibid.*)

"The information material to a decision concerning the administration of a psychotherapeutic drug or physical restraint, or the prolonged use of a device that may lead to the inability of the patient to regain use of a normal bodily function shall include at least the following: [¶] (1) The reason for the treatment and the nature and seriousness of the patient's illness. [¶] (2) The nature of the procedures to be used in the proposed treatment including their probable frequency and duration. [¶] (3) The probable degree and duration (temporary or permanent) of improvement or remission, expected with or without such treatment. [¶] (4) The nature, degree, duration and probability of the side effects and significant risks, commonly known by the health professions. [¶] (5) The

---

[27] That Act applies to nursing homes that have provider agreements under the Medicaid or Medicare programs. (See *Cal. Advocates for Nursing Home Reform, Inc. v. Chapman* (N.D. Cal. June 3, 2013, No. 12-CV-06408-JST) 2013 U.S. Dist. Lexis 77807, at pp. *2-3; 42 U.S.C. §§ 1395i-3(g)(1)(A), 1396r(g)(1)(A) [requiring state certification of compliance by facilities].) The Director informs us that only a small fraction of the state's nursing homes are not certified for participation in these programs, in some cases because they are in process of obtaining certification.

51

reasonable alternative treatments and risks, and why the health professional is recommending this particular treatment.  [¶]  (6) That the patient has the right to accept or refuse the proposed treatment, and if he or she consents, has the right to revoke his or her consent for any reason at any time."  (Cal. Code Regs., tit. 22, § 72528, subd. (b); see also *id.*, § 72527, subd. (a)(5).)

Under federal regulations, facilities must ensure that antipsychotic drug therapy is not given to residents who have not previously used psychotropic drugs "unless the medication is necessary to treat a specific condition as diagnosed and documented in the clinical record," and they must give residents "gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs." (42 C.F.R. § 483.45(c)(3), (e)(1) & (e)(2).)  Each resident's drug regimen must be reviewed on a monthly basis by a pharmacist, who must report "irregularities," and facilities must act on such reports.  (42 C.F.R. § 483.45(c)(1) & (c)(4).)

The Director assures us the Department, too, is concerned about overuse of antipsychotic drugs in nursing homes.  She nevertheless appeals the superior court's order requiring judicial approval of such prescriptions, arguing (1) the legislative history of section 1418.8 shows it was intended to allow the IDT procedure for prescription of antipsychotics; (2) no restrictions on such use of the statute are mentioned in the statute itself; and (3) due to efforts by the Department and other agencies over the past few years, prescriptions of antipsychotics in nursing homes have declined by more than 48 percent in California.  (See part IV.G.2, *ante*.)  The Department argues that without availability of the IDT procedure, patients who need antipsychotics will not get them in a timely manner and will suffer distress and possibly transfer to an acute care or psychiatric facility as a result.  The Department has never condoned or encouraged the abuse of antipsychotics in nursing homes, so far as we can tell from the record.

4.  *The Legal Background*

*Rains* did not discuss the administration of antipsychotic drugs to nursing home patients found incompetent under section 1418.8.  The only inferential reference to antipsychotic drugs in section 1418.8 itself is the authorization of "chemical restraints" in

52

an emergency, without a prior IDT determination to administer such restraints.
(§ 1418.8, subd. (h); *Rains*, *supra*, 32 Cal.App.4th at p. 186.)  If such "chemical restraints" are used, an IDT must be convened within one week thereafter to evaluate that use.  (§ 1418.8, subd. (h).)  Petitioners argue that the IDT process cannot be used to prescribe antipsychotics due to the statute's lack of procedural safeguards required as a matter of due process.  They rely on a handful of cases concerned with forcible administration of antipsychotics in settings distinct from that of the nursing homes with which we deal.

We are convinced that context matters, and the same procedures employed in prison settings need not be employed in nursing homes, not because nursing home residents are less worthy of protection (obviously they are not), but because nursing home patients have the protection of other laws sufficient to protect their privacy interests.  And because of the urgency of medical decisions in nursing homes, and the size and staffing of the facilities, the same procedures need not be employed as are used in prisons or mental hospitals in order to comply with due process.

The right to refuse antipsychotic medication is not absolute but may be limited by countervailing state interests.  (*Qawi*, *supra*, 32 Cal.4th at p. 15.)  *Rains* held the state's interest in providing care to its citizens who are unable to care for themselves on a timely basis is a compelling state interest (*Rains*, *supra*, 32 Cal.App.4th at p. 176), and we agree with that assessment.  Courts have permitted unconsented medical treatment of an adult when that adult has been adjudged incompetent.  (*Qawi*, *supra*, 32 Cal.4th at pp. 15-16; *Wendland*, *supra*, 26 Cal.4th at p. 535.)  We conclude the same result should hold true when an individual has been deemed incapacitated by his or her attending physician and lawfully prescribed an antipsychotic drug through an IDT process under section 1418.8.

In *Keyhea*, *supra*, 178 Cal.App.3d 526, a taxpayer action was brought challenging the practice at the California Medical Facility (CMF) of involuntary treatment of prisoners with antipsychotic drugs.  The decision to administer antipsychotic drugs involuntarily on a long-term basis was made by the chairman of an institutional review board upon referral by a prison psychiatrist.  (*Id*. at p. 531.)  The chairman's decision

53

would be made after an oral presentation by the referring psychiatrist, a review and discussion of the patient's file by the board members, and an interview of the prisoner. (*Ibid*.) CMF's internal procedure provided for the board to review the decision to medicate every 90 days. (*Ibid*.)

Under CMF's policy, inmates were afforded no right to counsel at board hearings and no right to judicial review. (*Keyhea*, *supra*, 178 Cal.App.3d at p. 531.) Penal Code section 2600 provides that a prisoner may be deprived only of such rights as necessary to provide for the reasonable security of the institution in which the prisoner is confined and for the reasonable protection of the public. The *Keyhea* court found that, by statute, state prisoners retained the same rights accorded to nonprisoners in this area, and further found that under the LPS statutory scheme, nonprisoners in California have a statutory right to refuse long-term treatment with antipsychotic drugs absent a judicial determination that they are incompetent to refuse treatment. (*Id*. at pp. 534-537.) *Keyhea* held state prisoners, like nonprisoners committed under the LPS Act, are entitled to a judicial determination of their competency to refuse treatment unless deprivation of this right is necessary to prison security. (178 Cal.App.3d at pp. 541-542.) The Court of Appeal held the trial court had properly ruled that prisoners were entitled to notice, judicial hearing, judicial determination, personal appearance, and assistance of counsel, as afforded to LPS committees. (*Id*. at p. 542, fn. 14.) The appellate court's ruling was based on statutory construction, however, not constitutional compulsion. (*Id*. at p. 541.)

*Qawi* also found procedures used for prescribing antipsychotic drugs to MDOs were insufficient to protect their rights, but again, it made the ruling as a matter of statutory construction, not constitutional analysis. (*Qawi*, *supra*, 32 Cal.4th at pp. 24-25.) *Washington v. Harper* examined an institution's procedure for prescribing antipsychotics to prisoners and found it met constitutional requirements. (See parts IV.E.1 & IV.F, *ante*.) It did not thereby establish each feature of that procedure as a requirement of due process. In sum, none of the cases cited by petitioners sets specific due process requirements when state authorities prescribe antipsychotic drugs for persons in their custody or subject to their control.

54

Moreover, in each of the cases just discussed, there was a question of *forcible* administration of antipsychotics. In other words, we know the institutionalized individual objected to the administration of the drugs, whereas in considering a challenge to section 1418.8, the viewpoint of the patient is unknown. If the patient objects to being given antipsychotics, judicial review is available, and treatment with antipsychotics is usually not so urgent that the judicial process is unworkable for purposes of review. If the patient is not so staunchly opposed to the proposed medication, the IDT may be used as a viable first step to attempt to reach consensus on whether the medication should be administered. We have already held that the IDT process complies with due process, and that is true regardless of the nature of the medical intervention.

### 5. *The Superior Court's Decision*

The superior court's judgment on the antipsychotics issue included the following directive:

"II. [¶] (A) That the use of Health and Safety Code section 1418.8 is prohibited for the administration of antipsychotic drugs to residents unless authorized pursuant to the procedures set forth in Probate Code section 3200 et seq., except in emergency situations as emergencies are defined under California law; [¶] (1) Provided, however, that for those residents already receiving an antipsychotic drug pursuant to the process set out in section 1418.8, subdivision (e), the facility is prohibited from continuing to implement the prescription or order for such drug, after 180 days following issuance of this writ, absent: (a) notification in writing of the right to contest the above determinations and decision set forth in I. above; and (b) implementation by the Department of procedural safeguards consisting of either a judicial finding of incompetency as in *In re Qawi* (2004) 32 Cal.4th 1 or *Keyhea v. Rushen* [(1986)] 178 Cal.App.3d 526, or an independent review process with notice and opportunity to be heard as in Washington v. Harper (1990) 494 U.S. 210."

The superior court thus read *Washington v. Harper*, *Qawi*, and *Keyhea*, as establishing the procedural safeguards necessary for due process. The trouble is, as

described above, none of those cases sets forth minimum constitutional requirements for a procedure used to administer antipsychotics even in the context in which they were set; they certainly did not set forth constitutional due process requirements for determination of medication needs in nursing homes.

6. *As a Matter of Statutory Construction, There is No Basis for Treating Prescription of Antipsychotics Differently from Other Proposed Medical Interventions*

In construing a statute, we turn first to the words used, for that is the best indicator of legislative intent. (*Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 1000; see *Lippman v. City of Oakland*, *supra*, 19 Cal.App.5th at p. 756.) Looking at the statutory text here, the specific question presented is whether a prescription for antipsychotics is a "medical intervention" as used in section 1418.8, subdivision (a). We conclude it is.

Although we, too, begin with the foundation established by the holding in *Rains*— which we view as basically sound—this case presents issues outside the context of the "routine, day-to-day" medical decisionmaking, and those issues, we think, not only require us to expand upon *Rains*, but to reexamine some aspects of the approach to statutory interpretation the *Rains* court took. (*Lucent Technologies, Inc. v. Board of Equalization* (2015) 241 Cal.App.4th 19, 35 (*Lucent*) [recognizing "latitude [each Court of Appeal panel has] to disregard the decisions of . . . sister Courts of Appeal (and even our own prior decisions) [citation] . . . when there is 'good reason' to do so"].) *Rains* did not address the issue of whether administration of antipsychotic drugs is permitted under section 1418.8, but it did opine that section 1418.8 applied only to nonintrusive, routine medical procedures. (*Rains*, *supra*, 32 Cal.App.4th at p. 186.) Petitioners suggest that the severe side effects of antipsychotics renders them non-routine and extremely intrusive, therefore meriting special protection for nursing home residents. We find no language in the statute to support the interpretation that it applies only to routine medical interventions.

*Rains* relied on language in the preamble to section 1418.8 suggesting it was required to make sure nursing homes could secure substituted consent to meet their

patients' medical needs, including "day-to-day medical treatment decisions . . . on an on-going basis," which were difficult to secure using the pre-existing legal methods. (Stats. 1992, ch. 1303, § 1(b), p. 6327.) The preamble, by our reading, does not limit section 1418.8's application to those "day-to-day" decisions, however. Although the conception of section 1418.8 the *Rains* court adopted in passing on the issue of facial constitutionality appears to be predicated on an understanding that the preamble may be read as, in effect, a limitation on the reach of the statute, this case requires us to confront the question in a specific setting, as applied. While we otherwise agree with the *Rains* holding, on this specific point we do not. (*People v. Allen* (1999) 21 Cal.4th 846, 858-861 (*Allen*) [uncodified statement of legislative intent may not be read into the text of the statute itself to justify construction contrary to plain meaning].)

We see no evidence in the text of the statute that the preamble was intended to be anything more than illustrative. Giving the operative statutory text its plain meaning, as we must, we conclude that section 1418.8 was drafted with breadth enough to cover antipsychotic medications, even though their effects on patients is anything but "routine." In an apparent effort to fit the case within *Rains*, the Director asserts, to the contrary, that the administration of antipsychotic drugs is "routine" in nursing homes. Finding no support for this position, the superior court rejected the argument that administering antipsychotics could accurately be characterized as "nonintrusive and routine, ongoing" care. It was justified in doing so, but even if administration of antipsychotic drugs in nursing homes is "routine" in the sense that it is common, as several amicus briefs suggest, we find the issue to be beside the point because we do not view section 1418.8 to be limited to "routine" medical interventions.

The superior court held, "Patients in skilled nursing facilities and intermediate care facilities are entitled to no [fewer] rights than mentally ill patients and prisoners, and therefore are either entitled to procedural safeguards consisting of either a judicial finding of incompetency as in *Qawi* and *Keyhea*, or some type of independent review process of the attending physician's recommendation to administer antipsychotic drugs along with notice and opportunity to be heard as in *Washington* [*v. Harper*]." Because section

57

1418.8 does not provide such procedural safeguards, the court found the Department's application of section 1418.8 permitting patients to be treated with antipsychotic drugs under this statutory procedure would violate these patients' due process rights. In order to avoid this unconstitutional result, the superior court construed section 1418.8 as simply not applying to administration of antipsychotic medications: "Since section 1418.8 was not intended to permit administration of antipsychotic drugs, compliance with the procedures set forth in Probate Code section 3200 et seq. would still be required, except in emergency situations." We cannot accept this construction of the statute, as further explained below.

7. *As a Matter of Due Process, Residents are Entitled to No Greater Rights in the Prescription of Antipsychotic Medications than in Any Other Prescription*

We see no textual reason for excepting antipsychotic medications from the procedure established in section 1418.8, and no mode of constitutional analysis requires us to read it that way. The same due process safeguards found to be required in the inherently coercive context of involuntary commitments are not required here. (*Rains*, *supra*, 32 Cal.App. 4th at pp. 186-187.) For incapacitated nursing home residents section 1418.8 provides an approximation of informed consent, while for prisoners and MDOs informed consent is disregarded altogether. A higher level of due process scrutiny is self-evidently necessary in that setting. We must examine section 1418.8 as it comes to us, bearing in mind that " 'due process is flexible and calls for such procedural protections as the particular situation demands.' " (*People v. Ramirez*, *supra*, 25 Cal.3d at p. 268, quoting *Morrissey v. Brewer*, *supra,* 408 U.S. at p. 481.)

Although we part ways with *Rains* in assessing the breadth of the statute, we see the context in essentially the same way that court did. The situation here is that of individuals, often elderly and poor, who have been determined by their doctors to lack the capacity to make their own medical decisions, who have no advance directive, no conservator, no surrogate decisionmaker, and no next of kin or other family or friends to speak up for them. As a premise to application of the statute, we will often know nothing

58

about their wishes in the circumstances. Their privacy and self-determination interests, while remaining precious, are somewhat diminished by their very physical and mental condition. The nursing home has a strong and often urgent interest in getting these patients their medications, including antipsychotic medications if necessary to treat a medical condition (and not used for patient control). As described above, the statutory and regulatory framework now in place sets clear limitations on the use of psychotherapeutic drugs. If the Director implements the law as written, the kind of abuse that has been described to us should not occur.

We admit to alarm at the descriptions of rampant abuse of antipsychotic medications that are contained in the amicus curiae briefs filed on behalf of the petitioners, as well as petitioners' somewhat anecdotal evidence submitted at trial. We anticipate that the changes we have mandated as a matter of due process—written notice to the resident and at least one additional supportive person, an opportunity to oppose treatment and capacity determinations in the IDT process by mandatory participation of a patient representative, and the opportunity for a judicial decision via judicial remedies authorized by section 1418.8, subdivision (j)—will help to prevent future abuse of antipsychotics in nursing homes. Those changes, together with vigilant enforcement of existing laws and regulations, should offer protection to nursing home patients, while not requiring judicial intervention in every prescription of antipsychotic medication.

## H. As-Applied Challenge: Applicability of Section 1418.8 to End of Life Decisions

### 1. *The Trial Court's Ruling and the Contentions of the Parties*

In the last set of issues framed by the parties, we are tasked with reviewing an injunction against the use of section 1418.8 "to make end of life decisions regarding the withholding or withdrawal of life-sustaining treatment for [nursing home] residents," subject to four exceptions, first for decisions implementing a patient's wish to end life, second for decisions carrying out a patient's instructions, third for decisions to decline patient instructions for ineffective care or care contrary to generally accepted medical standards, and fourth for decisions to cease curative care and begin hospice care. The

59

injunction issued upon an order granting petitioners' request for a writ of mandate on their eighth cause of action, which attacks the use of section 1418.8 "for treatments or discontinuation thereof *which would result in death*, such as, but not limited to[,] do not resuscitate, comfort care or discontinuation of treatment, or for POLST orders." (Italics added.)[28]

Petitioners contend section 1418.8 must not be used to end the lives of nursing home residents, and to the extent it has been so used, it violates due process and the California constitutional privacy guarantee. (Cal. Const., art. I, §§ 1, 7.) In 1993, a memo describing the implementation of the relatively new section 1418.8 was written by the Department of Health Services'[29] Licensing and Certification branch and sent to District Administrators throughout the state. The memo included a "Question and Answer" sheet which posed, as one potential question, whether section 1418.8 could be used to withdraw or withhold life-sustaining treatment. It then answered the question: "No. H & S Code, Section 1418.8, authorizes the IDT to make decisions regarding medical interventions. *Since withdrawing or withholding life sustaining treatments are not medical interventions, this statute does not authorize the IDT to make these decisions on behalf of residents*." (Italics added.) But the Director now takes the position, as she did in the superior court, that while section 1418.8 is not designed for decisions to withdraw or withhold life-sustaining treatments, it may be used for some end of life decisions, such as the use of DNR orders directing that medically intrusive and painful resuscitative life-saving procedures not be used, or that terminally ill patients be sent to

---

[28] "POLST" means a "request regarding resuscitative measures that directs a health care provider regarding resuscitative and life-sustaining measures." (Prob. Code, § 4780, subd. (a)(3); see *id.*, § 4788, subd. (a)(3).) A patient or the patient's legal surrogate and a physician, nurse practitioner, or physician's assistant must sign the POLST in order for it to be enforceable. (Prob. Code, § 4780, subd. (c).) A "do not resuscitate" (DNR) order is "a written document, signed by . . . a legally recognized health care decisionmaker, and . . . the individual's physician, that directs a health care provider regarding resuscitative measures." (§ 4780, subd. (a)(1); see *id.,* subd. (e)).

[29] The Department of Health Services was the predecessor to the Department.

hospice care.[30]  The Director urges us, however, not to reach the merits of the issue because the superior court's order was an advisory opinion, because the review of that order raises issue that are not yet ripe for decision, and because the court improperly attributed actions by nursing homes to state action by the Department.  If we reach the merits, the Director urges us to preserve an exception for referral to hospice care, which she argues is not an "end of life decision."

### 2. *Justiciability*

We reject the contention that any review of the superior court's ruling on the use of section 1418.8 for end of life decisionmaking is nonjusticiable on any of the grounds the Director advances.  The superior court made specific factual findings about the practices of IDT's in making end of life decisions, and in doing so ruled on a concrete, live controversy that placed in doubt the constitutionality of section 1418.8 and its ongoing applicability—or inapplicability, as the case may be—to thousands of nursing

---

[30]  The declaration of Dr. Steinberg, submitted in opposition to petitioners' motion for writ of mandate, states that:  "Denying unbefriended residents the opportunity for IDT's to make certain decisions regarding appropriate end of life care would result in unnecessary pain and harm to residents, mandated provisions of care that is contrary to generally accepted health care standards, and the denial of care to which they are legally entitled.  For example, cardiopulmonary resuscitation (CPR) is not indicated in cases of cardiac or respiratory arrest of certain frail, terminally ill patients where CPR is highly likely to be medically ineffective and to cause broken ribs and other complications for the very small percentage of such individuals who survive the initial arrest.  Many geriatricians and other health care professionals believe it would be not only a distinct unkindness, but also medically futile (sometimes called 'medically ineffective') treatment, which doctors are not required to provide.  Most unbefriended residents, in the absence of an advance directive, pre-existing Physician Order for Life Sustaining Treatment (POLST), or other information about their treatment wishes, would be unable to obtain any such 'do not resuscitate' order if resort to court approval or conservatorship appointment were required due to practical and financial constraints.  Also, terminally ill residents are entitled under Medicare to the benefit of hospice care.  This care provides immeasurable benefits to residents with advanced terminal illness that helps them die with dignity, including specialized pain-relieving care and additional social service support . . . .  However, if court intervention or conservatorship were required to make hospice referrals, many residents would be denied their rights to receive hospice benefits."

home residents across the state. The test for ripeness requires us to consider not only whether the issue presented is appropriate for judicial resolution, but any hardships that may result if we refuse to decide the issue now. CAHF, as an intervenor in the superior court, estimated that 15 percent of the nursing home residents covered by section 1418.8 (900 to 1,800 residents) currently receive hospice or palliative care through the section 1418.8 process. Even if we thought the issue might be unripe (and we do not), the risk of grave consequences to a significant number of Californians would nevertheless move us to answer the questions posed now. And as for the Director's state action objection, "the state constitutional right to privacy (Cal. Const., art. I, § 1), one of the traditional sources of a patient's right to autonomy and bodily integrity, protects against private conduct[.]" (*Wendland*, *supra*, 26 Cal.4th at p. 541, fn. 10.)

### 3. *Petitioners Have Not Established That Section 1418.8 Has Been Used for True "End of Life" Decisions*

Turning to the merits, we will reverse the order granting writ relief on the petitioners' eighth cause of action. We see no evidence in the record to support any use of IDT's by nursing homes to make end of life decisions *which result in death*, which is what petitioners alleged and here on appeal remains the thrust of their argument, supported by repeated references in their briefs to "life ending" decisions.[31] The evidentiary record supporting the eighth cause of action consists of a series of declarations from social workers and ombudsmen knowledgeable about practices of nursing facilities in different parts of the state, and relatives of individuals who have passed away but who were once nursing home residents, recounting situations in which nursing home staff members—acting on their own, without consulting the resident, and

---

[31] Petitioners' opening brief on cross-appeal at pages 30, 57 (IDT's are making decisions under section 1418.18 "to end lives"); *id*. at page 58 ("the Department is in no way limiting the ending of lives"); *id.* at page 77 ("When statutes permit ending life, they say so explicitly."); *id*. at page 78 ("far greater protections would be required to cause death" than section 1418.8 provides"); *ibid*. ("result" of decisions under section 1418.8 to cease curative care is "final, unappealable death").

sometimes without even pretense of the authority from an IDT or a physician—imposed or changed a POLST or a DNR order, or decided to place a resident on comfort care, sending the person to hospice care and ceasing all curative treatment. Citing these declarations, the trial court specifically found that nursing homes are "making end of life decisions without consulting patients and without considering the patient's wishes as to end of life decisions."[32]

There is an evidentiary gap between what was pleaded on this issue and what was proved. The problem here is that the principal case cited by the petitioners in support of the eighth cause of action, and relied upon by the superior court in issuing writ relief on that claim, *Wendland*, *supra*, 26 Cal.4th 519, does not speak of "end of life decision[making]." That broad phrase, which the superior court adopts in its order granting writ relief, encompasses a range of decisions that may lead to the process of dying, or relate to it in some way, but that do not themselves "result in death." Especially

---

[32] The principal findings were as follows: (1) "[T]he declaration of ombudsman Cheryl Simcox describes being at IDT meetings that discuss decisions such as hospice care, [and] DNR [Do Not Resuscitate] . . . ." (2) "Social Worker Margaret Main also describes a patient whose wishes included that she did not want life sustaining treatment were conveyed to the RN and social service designee, but the primary physician determined that the patient lacked capacity and changed the POLST to CPR and full code. . . . The social worker later found a cousin of the resident to sign the POLST reflecting the patient's wishes, but Main points out that the patient could have been subjected to various life sustaining treatments against the patient's wishes." (3) "A physician order for life-sustaining treatment (POLST) was signed by a physician, but not by [resident] Mark [H.], that stated 'full code' [meaning full life-sustaining treatment] when Mark [H.] entered the nursing facility. Prior to a meeting by the IDT, [local ombudsman Geneva] Carroll visited Mark [H.] and asked if he wanted to live or die, but he did not respond, nor did his facial expression change, although when Carroll left, he stated 'come back any time.'. . . At a meeting of the IDT, Carroll discovered that no one had asked Mark [H.] what he wanted so the IDT went to talk to him, but all he said to the nurse practitioner that spoke to him was 'Do you know what I am?' Thereafter, the meeting resumed and Mark [H.]'s POLST was changed from full code to comfort care only, meaning Mark [H.] would receive no life sustaining treatment although he would receive nutrition . . . . Mark [H.] passed away at the facility while in the care of hospice in February 2013," about two months after the change in his POLST.

63

given the magnitude of the issues presented here, we think it important to speak with precision about the types of decisions at issue in this case—as established by the evidence presented—rather than in broad generalities.

4. *This Case Is Not Governed by* Wendland

At issue in *Wendland* was a stark, life-or-death decision about whether to withhold life support from a conscious but incapacitated patient who faced imminent death without it. (*Wendland*, *supra*, 26 Cal.4th at pp. 523-524.) After spending more than a year in a coma following an auto accident, Robert Wendland, the patient in *Wendland*, remained severely disabled, physically and cognitively, despite years of therapy. (*Id*. at p. 524.) He was able to supply some yes or no answers using an augmented communication device, and on one occasion after answering a series of such questions, he did not answer when asked whether he wished to die. (*Id*. at p. 528.)

Rose Wendland, Robert's wife and conservator, authorized a series of surgeries to replace dislodged feeding tubes, but when asked to do so on a fourth occasion, declined to approve it. (*Wendland*, *supra*, 26 Cal.4th at pp. 525-526.) Robert's treating physician inserted a temporary tube pending decision from the hospital ethics committee, and that committee ultimately supported Rose's decision. (*Id.* at p. 526.) The case arose when Robert's mother and sister objected to Rose's instruction to the medical team that they remove his temporary feeding tube and let him die. (*Id.* at p. 524.) Because there was an objection, Rose sought approval for her proposed decision from the probate court, where she argued that as conservator she had exclusive authority to make all medical decisions on Robert's behalf she deemed appropriate so long as she believed they were in his best interest. (*Id.* at pp. 552-553.) Our Supreme Court ultimately determined that the trial court properly denied Rose's request. (*Id.* at p. 524.)

As framed in the Supreme Court, the issue presented was whether a conservator may "withhold artificial nutrition and hydration from a conscious conservatee who is not terminally ill, comatose, or in a persistent vegetative state, and who has not left formal instructions for health care or appointed an agent or surrogate for health care decisions." (*Wendland*, *supra*, 26 Cal.4th at pp. 523-524.) "Interpreting Probate Code section 2355

64

in light of the relevant provisions of the California Constitution" (*Wendland,* at p. 524)—the privacy clause, Article I, section 1, securing a right to refuse medical treatment, which is in turn rooted in the fundamental right of personal autonomy (*Wendland,* at pp. 531-532)—the court held that "a conservator may not withhold artificial nutrition and hydration from such a person absent clear and convincing evidence the conservator's decision is in accordance with either the conservatee's own wishes or best interest." (*Id.* at p. 524.) That burden of proof was not met, the court found, under the "dual standard" governing conservator decisionmaking under Probate Code section 2355 (*Wendland,* at p. 542): either the "primary standard" for evaluating Rose's proposed decision (based on Robert's actual wishes) (*id.* at pp. 542-552), or the "fallback" best interests standard (which applies in all cases where the patient's wishes cannot be determined) (*id.* at pp. 552-554).

It seems clear why petitioners characterize the IDT determinations they seek to challenge in the eighth cause of action, in blunt terms, as "decisions to end life." That is the causative framing used by the *Wendland* court. (*See Wendland*, *supra*, 26 Cal.4th at p. 554 ["the exceptional case where a conservator proposes to end the life of a conscious but incompetent conservatee"]; *id.* at p. 530 ["the conservator has claimed the authority to end the conservatee's life"]; *id.* at p. 538 ["[a]t the time the Legislature was considering the present version of section 2355, no court had interpreted any prior version of the statute as permitting a conservator deliberately to end the life of a conscious conservatee," italics omitted]; *id.* at p. 545 ["the primary standard for decisionmaking set out in section 2355 does articulate what will in some cases form a constitutional basis for a conservator's decision to end the life of a conscious patient"].) But *Wendland* used this language to describe the plight of a conservatee who faced certain death if deprived of life support, which is why temporary life-sustaining measures had to be taken while his conservator's decision to "pull the plug" was litigated.

We are unpersuaded *Wendland* is controlling here. That case, at its core, turns on " 'the "gravity of the consequences that would result from an erroneous determination of" ' " a decision to remove a conscious but impaired patient from life support.

65

(*Wendland, supra,* 26 Cal.4th at p. 546.) By contrast to situations where there is " 'the potential that a wrong decision will eventually be corrected or its impact mitigated[,] [a]n erroneous decision to withdraw life-sustaining treatment . . . is not susceptible of correction.' " (*Id.* at p. 547.) To deal with circumstances where the "ultimate decision is whether a conservatee lives or dies" and the risk of error is that the conservator's decision will "subject him to starvation, dehydration, and death" while he silently dissents but cannot speak (*ibid.*), the *Wendland* court chose to set the conservator's burden of proof at a level high enough to protect the conservatee's fundamental right to personal autonomy. And that called for the most demanding civil burden—clear and convincing proof. (*Id.* at p. 554.)

None of the IDT decisions set forth in petitioners' declarations involving POLSTs, DNR orders or hospice care are life or death decisions that would expose the patient to "starvation, dehydration, and death." (*Wendland, supra,* 26 Cal.4th at p. 547.) They are all decisions that, if erroneous, nonetheless remain subject to change within an IDT process that meets the constitutional requisites we have set forth in this opinion. None involves a decision that, at least so far as the record here shows, directly and inexorably resulted in death. It seems to us that they are better characterized, instead, as decisions made *in anticipation of the end of life*, since they all have to do with ensuring comfort and quality of life, as a patient's end draws near.[33] Anyone subject to a change in a

---

[33]Much of the dispute between the parties over what petitioners characterize as "life ending" decisions revolves around the question whether a referral to hospice care, in particular, should be characterized as such a decision. We agree with the Director that it is not properly so characterized. To the contrary, it is most often a choice in favor of comfort and quality of life over unbearable pain. Essentially, hospice care "recognizes that the impending death of an individual warrants a change in the focus from curative care to palliative care for relief of pain and for symptom management." (Medicare Program, FY 2017 Hospice Wage Index and Payment Rate Update and Hospice Quality Reporting Requirements, 81 Fed.Reg. 52144, 52145 (Aug. 5, 2016) (Medicare Program Update); see 48 Fed.Reg. 56008, 56008 (Dec. 16, 1983).) The "goal of hospice care is to help terminally ill individuals continue life with minimal disruption to normal activities while remaining primarily in the home environment." (Medicare Program Update, *supra*, 81 Fed.Reg. 52145.) "[H]ospice uses an interdisciplinary approach to deliver medical,

66

POLST or DNR order or to a hospice transfer decision will receive notice, and anyone on the IDT who has reservations about such matters can object, triggering the potential for judicial review not only before any such decision is implemented, but on an ongoing basis in the process of periodic IDT review.

### 5. *Section 1418.8 Covers the IDT Decisions Being Challenged in This Case*

As a matter of statutory interpretation, separate from their reliance on *Wendland*, petitioners argue that section 1418.8 may be used only for routine, day-to-day decisions to *initiate* nonintrusive medical treatment, which, so they say, cannot include decisions to *withhold or cease* treatment. We have dealt with the first step in this line of argument

---

nursing, social, psychological, emotional, and spiritual services through use of a broad spectrum of professionals and other caregivers, with the goal of making the beneficiary as physically and emotionally comfortable as possible." (*Ibid.*)

We see nothing in the federal statute and regulations governing Medicare coverage for hospice care requiring that life-sustaining care, such as insulin, therapeutic transfusions, dialysis, or a feeding tube—which are forms of supportive care, since they are not designed to bring about a cure—must be discontinued. These statutes and regulations prohibit transfer to hospice absent two physicians' determinations that the patient is terminally ill with a life expectancy of six months or less. (42 C.F.R. §§ 418.20, 418.22(b)(l).) For such Medicare beneficiaries, hospice care is a benefit under Medicare Part A. (42 U.S.C. § 1395d(a)(4).) Under Medicare, however, the patient must be notified of "the palliative rather than curative nature of hospice care, as it relates to the individual's terminal illness." (42 C.F.R. § 418.24(b)(2).) Upon electing hospice care, the patient waives other "Medicare services *that are related to the treatment of the terminal condition for which hospice care was elected or a related condition*," with certain exceptions. (42 C.F.R. § 418.24(d), italics added.)

Similarly, under California law, Medi-Cal provides a hospice care benefit for its beneficiaries that are terminally ill, which also is limited to a patient's last six months of life expectancy, and is offered "in lieu of other care." (Cal. Code Regs., tit. 22, § 51349, subds. (a), (c); Welf. & Inst. Code, § 14132, subd. (w); but see Welf. & Inst. Code, § 14132.75, subd. (a)(4).) But here, too, "[p]alliative care," which is utilized in hospice, is not inherently incompatible with curative care and does not by its nature require the end of curative care. Removing any doubt about this, legislation enacted in 2014 makes clear that palliative care is available along with curative care in California. (Welf. & Inst. Code, § 14132.75, subd. (a)(4).)

already in the context of the administration of antipsychotic medications. (See part IV.G.6., *ante*.) We reach the same conclusion here. The breadth of the statutory text, read plainly—"decisions concerning his or her heath care"—encompasses health care decisions made in anticipation of the end of life. In deciding the facial constitutionality of section 1418.8, the *Rains* court was not called upon to consider actual IDT decisionmaking, yet in dicta it placed a "routine, day-to-day" limitation on the statute by reference to the statutory preamble. Absent ambiguity, we see no need, nor is it proper, to delve into legislative intent suggested by uncodified language outside the body of the statute. (*Allen*, *supra*, 21 Cal.4th at pp. 860-861.) Faced, as we are, with an as-applied constitutional challenge to IDT decisionmaking that goes beyond "routine, day-to-day" medical treatment, we believe there is good reason to depart from the interpretation of section 1418.8 adopted in *Rains* on this specific point, while otherwise following its holding. (*Lucent*, *supra*, 241 Cal.App.4th at p. 35.)

As for the second step in petitioners' statutory interpretation argument—that the statute allows affirmative decisions to initiate treatment, but not decisions to withhold or cease treatment—the logic is strained, and we reject it. *Drabick, supra,* 200 Cal.App.3d 185, declined to adopt a similarly circumscribed construction of Probate Code section 2355 in a conservatorship case, holding that, "by necessary implication, [it] gives the conservator power to withhold or withdraw consent to medical treatment under appropriate circumstances. Probate Code section 2355 contemplates that the conservator faced with a decision about medical care will exercise his judgment. . . . Following this process, the conservator may consent to treatment. Just as importantly, however, the conservator may also withhold consent. Unless Probate Code section 2355 is read to include that correlative power, the statute would simply—and absurdly—require the conservator to approve blindly all medical recommendations. This cannot be what the Legislature intended, since to deny conservators the power to withhold consent would render meaningless the statutory references to a decisional process." (*Id*. at pp. 200-201.) The same reasoning applies here.

We close with another apt observation from *Drabick*, one that we think sums up well, in a general way, the importance of upholding section 1418.8 in application, and doing so in a way that it respects the constitutionally protected rights of nursing home residents. *Drabick*, like *Wendland*, involved a conservator's proposal to withdraw feeding and hydration tubes that were keeping the conservatee alive. (*Drabick*, *supra*, 200 Cal.App.3d at pp. 191-192.) That conservatee, William Drabick, was in even worse circumstances than those of Robert Wendland. He was unconscious, having been in a coma for more than two years when his conservator sought to remove him from life support. (*Id.* at p. 191.) In an opinion that thoroughly canvassed the applicable precedent a few years before *Wendland*, a Sixth District panel reversed a trial court order denying the conservator's request and directed it to reconsider. (*Drabick,* at p. 189.)[34]

Among other things, the *Drabick* court said this: "Once it is acknowledged that William Drabick has a right to have medical treatment decisions made in his best interests, it is readily apparent that the right is meaningless unless someone is permitted to make the decisions. To delegate an incompetent person's right to choose inevitably runs the risk that the surrogate's choices will not be the same as the incompetent's hypothetical, subjective choices. Allowing someone to choose, however, is more respectful of an incompetent person than simply declaring that such a person has no more rights. . . . As another court has observed, '[w]e do not pretend that the choice of [the incompetent's] parents, her guardian *ad litem,* or a court is her own choice. But it is a genuine choice nevertheless—one designed to further the same interests she might pursue had she the ability to decide herself. We believe that having the choice made in her behalf produces a more just and compassionate result than leaving [her] with no way of

---

[34] The Supreme Court disagreed with *Drabick*'s analysis in certain particulars (*Wendland*, *supra*, 26 Cal.4th at p. 537) and reached a different conclusion than *Drabick* did about the applicable burden of burden of proof (*Wendland,* at pp. 544-548), but notably left *Drabick*'s holding undisturbed in the context of a permanently unconscious and persistently vegetative conservatee (*Wendland,* at p. 555).

exercising a constitutional right.' " (*Drabick*, *supra*, 200 Cal.App.3d at p. 209, footnote omitted.)

The petitioners suggest there is indeed a way to ensure incapacitated, unbefriended nursing home residents may exercise their constitutionally protected rights, and that is to recognize a right to counsel and adjudication of those rights in a judicial forum. It is far from clear to us, however, that the adversary process which is so familiar to us in the court system is the optimal default means for decisions of the kind we have here, which are often as much ethical as they are medical and legal. (*Drabick, supra,* 200 Cal.App.3d at p. 204.) Section 1418.8 may not be a perfect solution to the difficult and nearly insoluble problem of providing for informed consent to medical treatment on behalf of decisionally incapacitated residents of nursing homes who are without family or friends to speak for them, but it was our Legislature's choice. While petitioners have done much in this case to expose the imperfections of the statutory scheme the Legislature enacted, it is our duty to uphold the challenged statute if it can be done in a manner that is consistent with constitutional imperatives. That is what we have done.

## V. DISPOSITION

The judgment is reversed and the cause is remanded to the superior court with directions to dissolve its injunction enjoining the enforcement and use of section 1418.8.

The superior court shall enter a modified judgment declaring that, to preserve the constitutionality of the statute, the court interprets section 1418.8 to require nursing homes to adopt, and the Department to enforce, the following procedural safeguards:

(1) *Notice*: Written and oral notice must be provided to every resident for whom section 1418.8 is invoked, of (a) any determination of the resident's incapacity; (b) any determination that no surrogate decisionmaker for the resident is available; (c) any medical intervention proposed by the attending physician; (d) the fact that a decision will be made by the IDT on a proposed medical intervention; (e) the resident's right to have a patient representative participate in IDT decisionmaking; and (f) the resident's right to judicial review of IDT decisions under section 1418.8, subdivision (j). All such written

70

notifications must be made not only to the resident, but also to at least one competent person whose interests are aligned with the resident.

(2) *Opportunity to be Heard*:  Except in emergency circumstances, no medical treatment decision by an IDT on behalf of a resident may be implemented until (a) after notice of the decision has been provided to the resident and (b) the resident has been given a reasonable opportunity to seek judicial review of the decision under section 1418.8, subdivision (j).

(3) *Composition of IDT*:  Except in emergency circumstances, (a) every IDT must include a patient representative, and (b) where the resident has no family or friend willing to serve on the IDT, someone unaffiliated with the nursing home must be found to serve as the patient representative.

In addition, the superior court's modified judgment shall declare that the IDT process may be used (1) to authorize the administration of antipsychotic medications in nursing homes to the extent authorized by state and federal law, and (2) for decisions to create or make a change to POLSTs, DNRs or comfort care orders, and to transfer patients to hospice care.

The parties shall bear their own costs on appeal.

_____

STREETER, J.

We concur:

_____

POLLAK, P. J.

_____

TUCHER, J.

A147987/*California Advocates for Nursing Home Reform v. Smith*

A147987/*California Advocates for Nursing Home Reform v. Smith*

Trial Court:                         Alameda County Superior Court

Trial Judge:                        Hon. Evelio M. Grillo

Counsel:

Morton P. Cohen; Law Offices of Amitai Schwartz and Amitai Schwartz for Plaintiffs and Appellants.

BraunHagey & Borden, Matthew Borden, and J. Noah Hagey for California Long Term Care Ombudsman Association as Amicus Curiae on behalf of Plaintiff and Appellants.

AARP Foundation Litigation and William Alvarado Rivera for AARP, AARP Foundation, National Consumer Voice for Quality Long-Term Care, and Justice in Aging as Amici Curiae on behalf of Plaintiffs and Appellants.

Disability Rights California, Katherine Mathews, Salma Enan, and Pamela Lew as Amicus Curiae on behalf of Plaintiff and Appellants.

ACLU Foundation Disability Rights Program, Claudia Center, and Susan Mizner; ACLU Foundation of Northern California and Alan L. Schlosser as Amici Curiae on behalf of Plaintiff and Appellants.

Xavier Becerra and Kamala D. Harris, Attorneys General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Susan M. Carson, Supervising Deputy Attorney General, Joshua N. Sondheimer, Deputy Attorney General for Defendant and Appellant.

Cole Pedroza, Curtis A. Cole, and Cassidy C. Davenport for California Medical Association, California Dental Association, and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant.

Hooper, Lundy & Bookman and Mark E. Reagan for California Association of Health Facilities as Amicus Curiae on behalf of Defendant and Appellant.